BAUMGARTNER'S ELECTRIC CONSTRUCTION CO., Respondent v. DE VRIES et al., Appellants

(91 N.W.2d 663)

(File No. 9629. Opinion filed July 21, 1958)

Rehearing denied September 3, 1958.

**Dana, Golden, Moore & Rasmussen,** Sioux Falls, and **David D. Weinberg,** Omaha, for Defendants-Appellants.

**Woods, Fuller, Shultz & Smith,** Sioux Falls, for Plaintiff-Respondent.

SMITH, J. The plaintiff recovered judgment below against the defendants Jim DeVries, Electrical Workers Local No. 426 of the International Brotherhood of Electrical Workers, and the International Brotherhood of Electrical Workers for $3,177.84 actual damages and $20,000 exemplary damages, and permanently enjoining them and one O. E. Root from picketing plaintiff, Baumgartner's Electric Construction Co. "for the purpose of inducing or persuading the Plaintiff to curtail or interfere with the free exercise of the right to work of Plaintiff's employees, or to compel or coerce Plaintiff's employees to join the union or to persuade the Plaintiff to terminate the employment of any of Plaintiff's employees on account of membership or non-membership in any Labor Union." We shall separately state and consider the questions presented by the appealing defendants. First, we develop a background of evidence. In so doing we shall refer to the plaintiff as "Baumgartners", to the defendant DeVries as the "manager", the defendant Local No. 426 as the "local" and the defendant International Brotherhood of Electrical Workers as the "International".

The International is an association of individual electrical workers and local unions. Its more than 600,000 members are organized into more than 18,000 chartered local unions. The constitution of International is binding on its members and is included in the bylaws of the locals.

The plaintiff, Baumgartner's Electric Construction Company, is a family corporation engaged in electrical construction contracting at Sioux Falls, South Dakota, within the territory assigned to the local. At the times in question it employed seven men, none of whom was a member of the local.

The plaintiff's purchases of material from out of the state for the year before trial amounted to $13,879.33. Its executive officer expressed the opinion that all of the

$69,220.73 worth of material used by it during that year was manufactured outside of South Dakota. The purchases of general contractors, under whom plaintiff held subcontracts, during the period amounted to $1,243,835 of which $182,788 was from out of the state.

In the spring of 1955 the manager was engaged in negotiations with the Sioux Falls electrical contractors as to the terms and conditions of a contract the local was to make with each contractor. By May 1st tentative terms of that contract had been agreed upon between the manager and several of the contractors. About that time the manager called on Tom Baumgartner. According to the manager he asked that Baumgartners go along with the same contract and conditions to which other contractors had tentatively agreed. He did not at that time ask Baumgartner's employees to join the union. He admitted that he was then engaged in "organizing" and that he tried to explain to Baumgartner the merits of running a shop which would "employ our people". According to Tom Baumgartner the manager said "they might take two of Baumgartner's men on permit, but one way they could prove they were good union men was by going to work for someone else; they couldn't work for Baumgartners. The rest, he said, would have to be replaced with union men." Baumgartner told him he had no objection to signing a union contract but it was up to his men; until they belonged to the union he would not sign. Two subsequent similar conferences were had in which Baumgartner refused to sign. On or about July 25th, following action by the local, the manager started picketing at certain of the projects in Sioux Falls where Baumgartners were doing work under subcontracts. The picket in each instance carried a sign reading "Electrical work on this job was not done by members of Local 426, IBEW". The manager said this was done to inform other workmen and contractors in Sioux Falls that Baumgartners were not complying and that he had spoken to the agents of the other crafts. He said we may have requested the support of the other crafts. Workmen of other crafts had worked with Baumgartner's men but as soon as the pickets appeared the union men left their work and the project shut down.

As a result, the general contractor, and, in one instance, an owner, instructed Baumgartners to discontinue its work and replaced it with a contractor who employed union men. Other crafts returned to the project as soon as the substitution was effected. By this process Baumgartners were successively taken off from eight projects it had under contract between July 25th and November 1st.

Among the picketed projects above mentioned were certain Sinclair stations on which Swift Bros. Construction Company was the general contractor. Mr. Swift was called as a witness for Baumgartners. They had contracts with Baumgartners on four stations. When the picketing started, Mr. Swift arranged a meeting at the Labor Temple with managers of the craft unions including Mr. DeVries. He proposed to them that they allow Baumgartners to complete two stations on which it had done considerable work, and he would arrange for a replacement on the other stations. His proposal was rejected. He testified that Mr. DeVries, the manager, stated at that meeting he could not give his blessing to working with nonunion craftsmen and he refused to call off his pickets.

Another project which was picketed was designated as the Reardon building. According to the testimony of the manager, he telephoned Mr. Reardon prior to the picketing "and told him Mr. Baumgartner was not complying with our agreement we had with other contractors in regard to wages and ratio of journeymen and apprentices, and I asked him if he would get a contractor who would comply; if not, we would possibly have to put a picket on his place."

Shortly after the picketing started plaintiff instituted this action. Its original complaint prayed only for a permanent injunction. The trial court issued a temporary restraining order. Thereupon the picketing ceased. After hearing upon an application of the defendants, the temporary restraining order was dissolved on August 15th. Thereupon picketing was resumed. Thereafter plaintiff amended its complaint and prayed for damages as well as a permanent injunction.

The first contention to be considered is whether the

trial court was without jurisdiction to issue the injunction because the Congress has vested exclusive jurisdiction in the National Labor Relations Board to deal with the conduct it has enjoined.

By Article VI, Section 2 of the constitution of South Dakota it is provided "* * * The right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union, or labor organization." Plaintiff's action is grounded upon this provision and the statutes (SDC Supp. 17.11) enacted in furtherance of the policy therein declared.

From the Labor Management Relations Act of 1947 (the Taft-Hartley Act) 29 U.S.C.A. § 141 et seq. we quote provisions as follows:

§ 157. "Employees shall have the right to * * * join * * * labor organizations, * * * and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."

§ 158 "(a) It shall be an unfair labor practice for an employer—

"(1) to * * * coerce employees in the exercise of the rights guaranteed in section 157 of this title; * * *

"(3) by discrimination in regard to * * * tenure of employment * * * to encourage * * * membership in any labor organization: **Provided,** That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (* * *) to require as a condition of employment membership therein * * * if such labor organization is the representative of the employees as provided in section 159(a) of this title, * * *.

"(b) It shall be an unfair labor practice for a labor organization or its agents— * * *

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section * * *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in * * * a concerted refusal in the course of their employment * * * to perform any services, where an object thereof is: (A) forcing or requiring any employer * * * to cease doing business with any other person; (B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;"

§ 160 (a) "The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: * * *"

The contention of defendants that plaintiff's grievance falls within the jurisdiction of the National Labor Relations Board and hence that the state court is without jurisdiction to enjoin the exhibited conduct is grounded on the supremacy clause of the Constitution of the United States and these provisions of the Taft-Hartley Act.

We approach consideration of this contention under the assumption plaintiff does not seriously question that the facts would warrant a decision by the National Labor Relations Board that the businesses involved affect interstate commerce. Cf. National Labor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284. And see Guss v. Utah Labor Relations Board, 353 U.S. 1, 77 S.Ct. 598, 1 L.Ed.2d 601; Amalgamated Meat Cutters v. Fairlawn Meats, Inc., 353 U.S. 20, 77 S.Ct. 604, 1 L.Ed.2d 613; and San Diego

Building Trades Council v. Garmon, 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618.

In Garner v. Teamsters C. & H. Union, 346 U.S. 485, 74 S.Ct. 161, 165, 98 L.Ed. 228, the court was considering peaceful picketing which a trial court had·held to be for the purpose of coercing an employer into influencing its employees to join a union contrary to the Pennsylvania Labor Relations Act, 43 P.S. § 211.1 et seq. In its opinion, written by the late Mr. Justice Jackson, these paragraphs appear.

"Congress has taken in hand this particular type of controversy where it affects interstate commerce. In language almost identical to parts of the Pennsylvania statute, it has forbidden labor unions to exert certain types of coercion on employees through the medium of the employer. It is not necessary or appropriate for us to surmise how the National Labor Relations Board might have decided this controversy had petitioners presented it to that body. The power and duty of primary decision lies with the Board, not with us. But it is clear that the Board was vested with power to entertain petitioners' grievance, to issue its own complaint against respondents and, pending final hearing, to seek from the United States District Court an injunction to prevent irreparable injury to petitioners while their case was being considered. The question then is whether the State, through its courts may adjudge the same .controversy and extend its own form of relief.

"Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules to avoid these diversities and. conflicts likely to result from a variety of local procedures and attitudes toward labor controversies. * * * A multiplicity of tribunals

and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law. The same reasoning which prohibits federal courts from intervening in such cases, except by way of review or an application of the federal Board, precludes state courts from doing so. Cf. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638, Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 783."

The holding was that the grievance there considered was not subject to litigation in the tribunals of the state.

In Weber v. Anheuser-Busch, Inc., 348 U.S. 468, at page, 475, 75 S.Ct. 480, 485, 99 L.Ed. 546, the court reviewed the course of its decisions under the Wagner and Taft-Hartley Acts. In treating of the Garner case, supra, it said, "A State may not enjoin under its own labor statute conduct which has been made an 'unfair labor practice' under the federal statutes. Such was the holding in the Garner case, supra." And it further said in 348 U.S. at page 479, 75 S.Ct. at page 487, "In Garner the emphasis was not on two conflicting labor statutes but rather on two similar remedies, one state and one federal, brought to bear on precisely the same conduct."

In International Brotherhood of Elec. Workers, etc v. National L. R. Bd., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299, in a case dealing with interstate commerce, it was held that a labor organization and its agent committed an unfair labor practice within the meaning of § 158(b) (4), supra, when by peaceful picketing, the agent induced employees of a subcontractor on a construction project, in the course of their employment, to engage in a concerted refusal to perform any services when the object of such inducement was to force a general contractor to cease doing business with another subcontractor. And see San Diego Bldg. Trades Council v. Garmon, 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed. 618, and Garmon v. San Diego Building Trades Council, 49 Cal.2d 595, 320 P.2d 473.

These authorities are controlling. The finding and conclusion of the trial court that the conduct of

defendants was intended to compel plaintiff to coerce its employees to join the local union or lose their employment, contrary to SDC Supp. 17.1101(1, 2) finds ample support in the evidence. And, if interstate commerce were not involved, it is settled that, consistent with the Fourteenth Amendment, the trial court would have been permitted to enjoin such conduct. International Brotherhood of Teamsters v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347. However, interstate commerce is involved and it is obvious the record would warrant a ruling by the National Labor Relations Board that defendants' conduct was proscribed as an unfair labor practice by § 158(b) (2, 4) supra. Their conduct and their testimony offer support for a finding by a trier of the fact that they sought through peaceful picketing to bring economic pressure to bear on plaintiff and cause it, by discrimination in regard to tenure of employment, to encourage its employees to join the local, and also to enhance that pressure on plaintiff, by inducing the employees of the general contractors, under whom plaintiff was working, to engage in a concerted refusal in the course of their employment to perform any services for the purpose and with the object of forcing those general contractors to cease doing business with plaintiff. It follows, as held in Garner v. Teamsters C. & H. Union, supra, that the exclusive primary jurisdiction to pass on this evidence and determine whether defendants' conduct constitutes an unfair labor practice and to decide whether remedial procedures should be initiated, rests in the National Labor Relations Board and hence the trial court was without jurisdiction to enjoin that conduct.

In contending that the trial court acted within its jurisdiction in enjoining the conduct of defendants, plaintiff rested heavily on Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 336 U.S. 301, 69 S.Ct. 584, 587, 93 L.Ed. 691, wherein the court upheld the Wisconsin court and that state's Employment Relations Board in ordering an employer to cease and desist from giving effect to a maintenance-of-membership clause in a contract with the union. Wisconsin permitted such a contract where at least two-thirds of such employees voting in a

referendum approve. No such referendum had been had approving the contract under which the employer acted. The employer's conduct in so doing constituted an "unfair labor practice" as defined by the Wisconsin statute, St.1947, § 111.06(1). Resting its decision upon the proviso contained in § 158(a) (3), which it said "merely disclaims a national policy hostile to the closed shop or other forms of union-security agreements" as clarified by § 164(b) reading in part: "Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by the State or Territorial law," it held there was no overlapping between the federal and Wisconsin provisions, and therefore that its Board and Courts operated within their powers. In Weber v. Anheuser-Busch, Inc., supra, 348 U.S. 468, at page 477, 75 S.Ct. 480, at page 486, 99 L.Ed. 546, the court pointed out the basis of its decision in Algoma Plywood and Veneer Co. in these words: "Since nothing in the Wagner or Taft-Hartley Acts sanctioned or forbade these clauses, they were left to regulation by the State." The conduct which was enjoined in the Algoma case by the state was not subject to control by the National Labor Relations Board as an unfair labor practice. Therefore, that decision is without controlling significance in a case, such as we are considering, in which the enjoined conduct of defendants is subject to control of the National Labor Relations Board as an unfair labor practice.

Review of the provision of the judgment awarding damages to plaintiff involves several questions to which we now turn.

■ The defendants contend that the Congress having preempted the jurisdiction of the courts to grant equitable relief against the exhibited conduct of defendants, it must have intended to preempt the jurisdiction of the state courts to impose sanctions by way of damages for injuries to business resulting from that conduct.

It is our understanding that the Supreme Court has expressed a contrary view in United Construction Workers

v. Laburnum Construction Corporation, 347 U.S. 656, 74 S.Ct. 833, 91 L.Ed. 1025, and in International Union, United Automobile, Aircraft and Agricultural Implement Workers of America v. Russell, 78 S.Ct. 932. And see San Diego Building Trades Council v. Garmon, 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618, and Garmon v. San Deigo Trades Council, 49 Cal.2d 595, 320 P.2d 473. Therefore, we hold the contention to be inadmissible.

In the Laburnum case, supra [347 U.S. 656, 74 S.Ct. 837], the court said. "Petitioners contend that the Act of 1947 has occupied the labor relations field so completely that no regulatory agency other than the National Labor Relations Board and no court may assert jurisdiction over unfair labor practices as defined by it, unless expressly authorized by Congress to do so. They claim that state courts accordingly are excluded not only from enjoining future unfair labor practices and thus colliding with the Board, as occurred in Garner v. Teamsters Union, 346 U.S. 485, 74 S.Ct. 161 [98 L.Ed. 228], but that state courts are excluded also from entertaining common-law tort actions for the recovery of damages caused by such conduct. The latter exclusion is the issue here. In the Garner case, Congress had provided a federal administrative remedy, supplemented by judicial procedure for its enforcement, with which the state injunctive procedure conflicted. Here Congress has neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct. For us to cut off the injured respondent from his right of recovery will deprive it of its property without recourse or compensation. To do so will, in effect, grant petitioners immunity from liability for their tortious conduct. We see no substantial reason for reaching such a result." And in that case it wrote, "To the extent, however, that Congress has not prescribed procedure for dealing with the consequences of tortious conduct already committed, there is no ground for concluding that existing criminal penalties or liabilities for tortious conduct have been eliminated. The care we took in the Garner case to demonstrate the existing conflict between state and federal administrative remedies in

that case was, itself, a recognition that if no conflict had existed, the state procedure would have survived. The primarily private nature of claims for damages under state law also distinguishes them in a measure from the public nature of the regulation of future labor relations under federal law."

The cause of action sounding in tort was tried to a jury. The court's instructions were predicated upon the constitution, statutes and decisions of the state. Request for application of § 303, 61 Stat. 158, 159, 29 U.S.C.A. § 187(b), was not presented to the trial court in any manner.

■■ Under assignments of error based on exceptions taken at the trial, the defendants attempt to assail many of the court's instructions. Space will not permit a reproduction of the many exceptions taken. A typical exception reads as follows: "The defendants and each of them take exception to the Court's instruction No. 12, for the reason that said instruction does not correctly reflect the evidence and testimony adduced at trial, and that said instruction does not correctly reflect the laws of the State of South Dakota or the laws of the United States." Because such an exception fails to specify the grounds of defendants' objections to the instruction assailed, it is insufficient upon which to predicate error. By SDC 33.1318, dealing with the settlement of instructions, it is provided: "* * * On such settlement each counsel, or party, shall specify and state the particular ground or grounds upon which the giving or rejecting of any instruction is objected or excepted to. It shall be insufficient to state generally that an instruction does or does not state the law, but it shall be necessary to specify clearly wherein any instruction, or part thereof objected to, is insufficient or does not state the law." According to the theory and design of our rules of practice, error may not be predicated upon a ruling of a trial court unless the matter has been fairly placed before it for decision by specifically pointing out the ground of fact or law relied upon by the litigant. SDC 33.1601. It follows that this group of assignments is ineffective to present the questioned rulings for review.

■ By its pleading, motions for directed verdict and appropriate assignments of error the International has

contended throughout that plaintiff has failed to establish its responsibility for the conduct of either the local or the manager. The contention is untenable.

The basic argument of the International is that its local unions are autonomous entities which are not authorized to act for the International in organizational activities. We do not reach that argument. It is our view that the constitution of the International and bylaws of the local make the manager of the local the agent of the International in organizing the territory within the jurisdiction of the local, and that the conduct of which plaintiff complains is that of the manager and was indulged in the course and scope of his agency.

Included in the objects of the International, as set forth as a preamble to its constitution, is the object, "To organize all workers in the entire electrical industry, including all those in public utilities and electrical manufacturing, into local unions, to promote reasonable methods of work," etc. By its constitution it asserts jurisdiction over all electrical wage workers. It also provides for the officers of the locals among which is one denominated a "Business Manager". With reference to such a manager it provides, "The business manager shall be held responsible to the L. U. and to the I. P. for results in organizing his territory, * * * and for protecting the jurisdiction of the I. B. E. W." (L. U. is shorthand for the local, I. P. for the International president, and I. B. E. W. for the International.

Among the powers with which the International President is clothed by the constitution is the power "To remove or suspend any L. U. officer, representative, appointee, or agent, * * * for incompetence or for non-performance of duties, * * * or for failure to observe or carry out instructions or decisions of the I. P." The Vice President of International is required to hold one or more "progress" meetings yearly with the manager. The bylaws of the local which under the constitution must be approved by International contain a peculiar limitation on the powers of the board and officers of the local reading as follows: "The Executive Board or Local

Union officers shall not interfere with the Business Manager in the performance of his duties."

 The business manager admitted that he was engaged in "organizing" when he was negotiating with Baumgartners. The inference is impelled that he was so engaged when directing all of the activities revealed by the record. The banner he placed in the hands of his pickets leaves no room for doubt as to the objective of those activities. It will be recalled that it read, "Electrical work on this job was not done by members of Local 426, I. B. E. W."

Organizational activities are the very lifeblood of unionism. Strength comes to a union from concerted action by a large proportion of the wage earners in a craft or industry, and from the flow of funds from the members to the local and upward to the supreme body. The constitution of International and the bylaws of the local provide for a variety of substantial fees, payments, assessments and dues, in all of which the International shares.

Because of the importance of this activity and therefore of the necessity that it receive constant, active and efficient attention, it is not surprising that International should desire a special agent in its major locals directly responsible to it for organizational work. International provided not only that the manager should be responsible to the International president for organizing his territory and subject to the instructions of that International officer, but it also provided that he be subject to removal by that officer for incompetency or failure to perform his duties.

 We interpret the constitution of International as creating a relationship of principal and agent between it and the manager, and we hold the organizational activities revealed by this record to have been performed within the scope of his agency. United Mine Workers v. Patton, 4 Cir., 211 F.2d 742, 47 A.L.R.2d 850. The International is responsible for tortious conduct of its agent indulged within the course and scope of his employment. SDC 3.0309; 2 Am.Jur., Agency, § 360.

In support of its contention that it is not responsible for the conduct we are considering, International points

to a provision of its constitution reading as follows, "No L. U. shall cause or allow a stoppage of work in any controversy of a general nature before obtaining consent of the I. P." and rests heavily on the decision of the Supreme Court in United Mine Workers v. Coronado Coal Co., 259 U. S. 344, 42 S.Ct. 570, 66 L.Ed. 975. In our opinion the holding is distinguishable because of the dissimilarity in the operative facts and the provisions of the controlling constitution.

Another contention of defendant is that the court erred in overruling their motion to strike plaintiff's claim for exemplary damages on the ground that "plaintiff has failed to show any conduct on the part of defendants of such a willful and malicious nature that warrants an award or submission to the jury of the question of exemplary damages under the statutes of South Dakota." Under our law exemplary damages are allowed "in addition to the actual damage". SDC 37.1902. And see Annotations 33 A.L.R. 384 and 17 A.L.R.2d 527. Hence this contention involves the sufficiency of the evidence to warrant an award of both compensatory and punitive damages. 15 Am.Jur., Damages, § 270, p. 706.

It will be recalled that in each of the successive instances, to which reference is made supra, the placing of pickets resulted in an identical train of events. When the pickets appeared other crafts walked off from the project and it was shut down until the owner or general contractor had replaced plaintiff and its nonunion men with union men; thereupon work resumed. To replace plaintiff and its nonunion men the owner or general contractor was forced to breach plaintiff's subcontract. The manager admitted at the trial that he had talked with the managing agents of other crafts and may have asked their support. He also admitted that he called one owner, Mr. Reardon, and asked him to replace plaintiff with a contractor who would conform to union practices. These facts support, if they do not impel, the inference that the manager intended to cause the contractors or owners to breach their contracts with plaintiff. Moreover the circumstances as a whole offer reasonable support for a belief

that if the injunction had not issued, and plaintiff had continued to refuse to bow to the will of the manager he would have pursued it from job to job with the same tactic until he had utterly destroyed its business. Whether his objective was to require the plaintiff to replace its employees with members of the union, as the banner carried by the pickets would indicate, or merely to coerce it to enter into a contract, such as those received in evidence, whereby it would agree to impose union practices and terms of employment on his nonunion men, and without their consent to designate the local as their bargaining representative, is not of controlling significance. In either event he was attempting to coerce plaintiff into doing that which is unlawful in this state .

By Chapter 92, Laws 1947, it is provided: Section (1) "* * * The right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union, or labor organization." And section (2) "Any agreement relating to employment * * * which * * * denies, abridges, interferes with, or in any manner curtails the free exercise of the right to work by any citizen .of the State of South Dakota, shall be deemed a violation of this Act."

Not only would these facts warrant a conclusion that the defendants were guilty of unlawful conduct in attempting to coerce the plaintiff into transgressing the law, but that they violated section 3 of the last cited act which reads, "Any request, demand or threat made by any person to any employer or employee, to persuade or coerce such employer or employee to enter into an agreement violative of the provisions contained in Sections 1 and 2 of this Act, shall be deemed a violation of this Act, and such person shall be punishable for a misdemeanor as hereinafter provided."

Plaintiff had a right to be free from this unlawful coercion and the consequent injury to its business, and the defendants were under a duty to abstain from so injuring plaintiff's business. SDC 47.0301. For such a willful and intentional harm to plaintiff the defendants are liable

to it, not only for compensatory damages, SDC 47.0304, see Lien v. Northwestern Engineering Co., 73 S.D. 84, 39 N.W.2d 483, but, in addition thereto to exemplary damages. SDC 37.1902. Malice may be presumed in the circumstances. Bogue v. Gunderson, 30 S.D. 1, 137 N.W. 595, 36 Ann.Cas. 1915B, 126. The contention that exemplary damages should not have been awarded against International for the unauthorized or unratified conduct of its agent is not before us because it was not presented to the trial court.

Another contention of defendants is that plaintiff's proof of damages through loss of profits is speculative and insufficient to support the verdict. The contention is inadmissible. Guerini Stone Co. v. P. J. Carlin Const. Co., 240 U.S. 264, at page 280, 36 S.Ct. 300, 307, 60 L.Ed. 636; Philadelphia, Wilmington & Baltimore R. R. Co. v. Howard, 13 How. 307, at page 344, 14 L.Ed 157.

In the case first cited it was written: "No more definite or certain method of estimating the profits could well be adopted than to deduct from the contract price the probable cost of furnishing the materials and doing the work." Such was the evidence adduced by plaintiff. Evidence of that character, in our opinion, is not speculative.

The final point made by the defendants is that the trial court erred in failing to grant a new trial on the ground that excessive punitive damages were granted under the influence of passion and prejudice. SDC 33.1605(5).

Our statute provides that "In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, * * * the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant."SDC 37.1902.

The authorities agree that "There is no fixed standard for the measurement of exemplary or punitive damages; the amount of the award is a matter largely within the discretion of the jury * * * on due consideration of the attendant circumstances." 25 C.J.S. Damages § 126, p. 737.

Elsewhere it has been written, "In assessing exemplary damages the nature, extent, and enormity of the wrong,

the intent of the party committing it, and, generally, all the circuumstances attending the particular transaction involved, including any mitigating circumstances which may operate to reduce without wholly defeating such damages, may be taken into consideration, * * *" 15 Am.Jur., Damages, § 298, p. 739.

■ The trial court is vested with power to grant a new trial if such an award appears to have been given under the influence of passion or prejudice. SDC 33.1605(5). Recognizing that, as a participant in the trial, the trial court is best able to judge whether a verdict is the product of passion and prejudice, this court will not disturb its decision except for clear abuse. Stene v. Hillgren, 77 S.D. 165, 88 N. W.2d 109. And see Kunz v. Johnson, 74 S.D. 577, 57 N. W.2d 116.

The defendants point to the fact that the punitive award made by the jury is appoximately six times as large as what is characterized as an over-liberal compensatory award. The innocence of wrongdoing of International is also asserted.

■ As the text quoted supra indicates the amount allowed as compensation to plaintiff is but one of the circumstances which should influence the conclusion of a jury in fixing the amount of the exemplary award. The amount allowed as compensation furnishes some measure of the enormity of the wrong of the defendant. In the circumstances at bar a jury of practical minds would recognize that plaintiff has actually suffered an unproved damage in loss of good will. It would be permitted to infer that the news of plaintiff's removal from job after job because of defendants' picketing would quickly circulate throughout the trade and would operate to deter owners, general contractors, and architects from seeking or recommending plaintiff's services. Hence, they could believe that the compensatory award failed to truly measure the seriousness of defendants' misconduct.

We turn to facts which it seems reasonable to believe the jury and the trial court deemed to be of controlling import in fixing the amount of the punitive award. The

conduct of the manager and his relation to International need not be described anew. Neither need we emphasize that the jury and the trial court were justified in believing the harm to plaintiff was both designed and intentional.

At a time when plaintiff had been forced off from two projects, a hearing was had upon the application of defendants to dissolve a temporary restraining order. An International representative stationed at Omaha, Nebraska, with an assigned territory including Nebraska and part of South Dakota, appeared at that hearing with an attorney. It was there revealed that plaintiff had been taken off from two projects because of the picketing above described. The restraining order then in force was dissolved and the picketing was immediately resumed. This area representative was also present and sworn as a witness at the trial. His cross-examination includes these questions and answers:

"Q. Well, will Mr. Baumgartner's operations be picketed in the future? A. I don't know.

"Q. By the I.B.E.W., I mean. A. I don't know.

"Q. In other words, they might. A. They could, yes; very likely."

From the fact that this knowledge which was brought home to International through its area representative induced no interruption or change in the campaign the manager was waging against Baumgartners, and from the further fact that after the campaign had succeeded in removing plaintiff from eight projects, the area representative thought it likely the I.B.E.W. would continue picketing Baumgartners' operations, the inference was warranted that the manager was but executing policies established by International.

■ From the exhibits in evidence and from the testimony of the area representative the jury gained an insight into the probable tremendous monthly income International received from its members. If such a giant, and other like giants were to be deterred from employing traditionally coercive organizational methods in South Dakota, the jury could reasonably conclude it needed

to fix an exemplary award which would cause such activities to appear to be unprofitable. The case is sui generis. In a case involving physical coercion and greater actual damage a Virginia jury made a punitive award of $100,000. United Construction Workers v. Laburnum Const. Corp., 194 Va. 872, 75 S.E.2d 694. We have determined we cannot say that the trial court erred in concluding that passion and prejudice had not influenced the jury in making its exemplary award.

Other matters argued have been carefully considered but are deemed not to merit discussion.

In so far as the judgment awards damages, it is affirmed; otherwise it is reversed.

All the Judges concur.