AGNES SYESTER, appellee, v. JAMES R. BANTA et al., d/b/a ARTHUR. MURRAY DANCE STUDIO, appellants.

No. 51504.

(Reported in 133 N.W.2d 666)

614

MARCH 9, 1965.

Dickinson, Parker, Mannheimer & Raife, of Des Moines, for appellants.

I. Joel Pasternak, of Des Moines, for appellee.

SNELL, J.—This is a law action seeking damages, actual and exemplary, for allegedly false and fraudulent representations in

the sale of dancing instruction to plaintiff. From the final judgment entered after a jury verdict for plaintiff in a substantial amount defendants have appealed.

Plaintiff is a lonely and elderly widow who fell for the blandishments and flattery of those who saw some "easy money" available.

Defendants are the owners of the Des Moines Arthur Murray Dance Studio. They have a legitimate service to sell but when their selling techniques transcend the utmost limits of reason and fairness they must expect courts and juries to frown thereon. In this case the jury has done so.

Since the beginning of recorded history men and women have persisted in selling their birthrights for a mess of pottage and courts cannot protect against the folly of bad judgment. We can, however, insist on honesty in selling. The old doctrine of caveat emptor is no longer the polestar for business.

Much of the testimony was uncontradicted. The testimony as to intentional fraud and misrepresentation as well as the motive and credibility of some witnesses was attacked but these were questions for the jury. It was for the jury to say who should be believed.

It is not for us to say who should have prevailed with the jury. It is for us to determine the sufficiency of the admissible evidence to generate a jury question and the correctness of the instructions given the jury. We will mention only as much of the testimony as is necessary for that purpose.

Plaintiff is a widow living alone. She has no family. Her exact age does not appear but a former employee of defendants and a favorite dancing instructor of plaintiff testified "that during the period from 1957 through the fall of 1960 she was 68 years old."

After her husband's death plaintiff worked at Bishops as a "coffee girl." She first went to the Arthur Murray Studio in 1954 as a gift from a friend. On the first visit there was no attempt to sell her any lessons but she was invited to return a few days later. When she returned she was interviewed by the manager and sold a small course of dancing lessons. From that time on

there appears to have been an astoundingly successful selling campaign.

The testimony of defendants' manager and his written summary of payments, received as Exhibit 1, are not in complete accord, but the variation is not vital. By May 2, 1955, defendants sold plaintiff 3222 hours of dancing instruction for which she paid $21,020.50. In all, according to the testimony of defendants' manager plaintiff paid $33,497 for 4057 hours of instruction. Because of some refunds and credits defendants' Exhibit 1 shows plaintiff's cost to be only $29,174.30. Defendants' Exhibit 1 is as follows:

"EXHIBIT 1

"SUMMARY OF
"DANCE COURSES PURCHASED
"BY AGNES SYESTER

| "DATE | SOLD BY | HOURS IN COURSE | AMT PAID |
|-------|---------|-----------------|----------|
| 9-27-54 | Brick | 206 | 1709.50 |
| 10-15-54 | Neidt | 300 | 2490.00 |
| 11- 4-54 | Neidt | 16 | 88.00 |
| 1- 8-55 | Bersch | 500 | 3825.00 |
| 1-19-55 | Bersch | 1000 | 6800.00 |
| 5- 2-55 | Bersch | 1200 | 6000.00 |
| 5-24-55 | Brick | 100 | 995.00 |
| 6-22-55 | Brick | 10 | 79.80 |
| 5-25-57 | Brick-Ziegler | 11 | 130.00 |
| 6-22-57 | Brick | 10 | 106.00 |
| 6- 4-58 | Carey | 10 | 106.00 |
| 9- 8-58 | Carey | 10 | 99.00 |
| 1- 6-59 | Erickson | 4 | 25.00 |
| 5-27-59 | Wolf | 10 | 116.00 |
| 6-10-59 | Wolf | 10 | 112.50 |
| 6-10-59 | Wolf | 10 | 112.50 |
| 12- 2-59 | Carey-Kenton | 25 | 290.00 |
| 3- 2-60 | Carey | 625 | 6090.00 |
| | | 4057 | $29174.30" |

On May 2, 1955, when plaintiff bought 1200 additional hours of instruction for $6000 she had already bought 2022 hours and had used only 261 hours.

Included in the courses offered were lifetime memberships. With the purchase of 1000 or 1200 hours of instruction it was the policy of defendants to give free attendance to weekly dances for life and two hours of instruction or practice a month to keep active on what had been learned. Included in plaintiff's purchases were three lifetime memberships. Plaintiff attended the weekly dances and incidental entertainments and admitted having fun.

Plaintiff testified that defendants' manager sold her the first lifetime membership. She testified "He promised me all the privileges of the studio and I would be a professional dancer." To make such a promise to a lady plaintiff's age was ridiculous. The fact that she was so gullible as to be an easy victim does not justify taking over $29,000 of her money. She may have been willing and easily sold but nevertheless a victim.

The members of defendants' staff were carefully schooled and supervised in the art of high-powered salesmanship. Mr. Jerry Carey, a witness for plaintiff, testified at length as to methods and as to his contact with plaintiff. There was evidence that Mr. Carey was a disgruntled former employee and instructor and had expressed hostility toward defendants, but his credibility was for the jury.

Defendants' studio occupies seven rooms consisting of a grand ballroom and six private studios. Each private studio is wired for sound so the manager could monitor conversations between instructor and student and without the student's knowledge correct the instructor's sales technique.

Mr. Carey had received two months' training including a course on sales technique taught by the manager. Plaintiff's Exhibit H is a revised edition of defendants' "Eight Good Rules For Interviewing." It is an exhaustive set of instructions, outlines and suggested conversations covering twenty-two typewritten pages. A few pertinent parts are:

"1. How to prevent a prospect from consulting his banker, lawyer, wife or friend.

"2. Avoid permitting your prospect to think the matter over.

"3. Tell the prospect that has never danced before that it is an advantage and tell the prospect that has danced before that it is an advantage.

"4. To dance with the prospect and then tell the prospect that the rhythm is very good, their animation or self-confidence is good, that their natural ability is very good. That they will be an excellent ballroom dancer in much less time and that if they didn't have natural ability it would take twice as long.

"5. To summarize the prospect's ability to learn as follows: 'Did you know that the three most important points on this D. A. are: Rhythm, natural ability and animation? You've been graded Excellent in all three.'

"6. In quoting the price for various courses, the instructor is supposed to say 'the trouble with most people is that they dance lifelessly, but as I told you on your analysis, you have animation-vitality in your dancing. No matter what course you decide on you're going to be a really smooth dancer (men would rather be a smooth dancer—women would rather be a beautiful, graceful dancer).'

"7. To use 'emotional selling' and the instructor is tutored as follows: 'This is the warm-up period and is a very important part of your interview. You have proved to him by now that he can learn to dance; now you must appeal to his emotions in such a way that he will want lessons regardless of the cost.' "

Theoretically, for advancing proficiency in dancing (the jury must have thought that $29,000 had something to do with it), plaintiff was awarded a Bronze Medal, then a Silver Medal and then a Gold Medal. These awards were given plaintiff all in the same year although defendants' manager testified that it takes approximately two to four years to qualify for a Bronze Medal, five to seven years for a Silver Medal and anytime after 1200 hours a student could qualify for the Gold Medal. Finally after considerable thought about new incentives for plaintiff to buy something more she was shown a film on Gold Star dancing. This is a difficult professional type of dancing. "The dancers on the film were brought in from Europe by Mr. Murray. The dancing is English quick step and is the type of dancing done by Ginger

Rogers and Fred Astaire only about twice as difficult." This film had been studied 15 to 20 times to determine what parts to stress with plaintiff.

Plaintiff was easily sold a Gold Star course of 625 hours for $6250. A few days later she came into the ballroom, handed Mr. Carey an envelope and said "Well, it took some doing but here is the money." The money was delivered to the manager.

The Gold Star course was started although even the instructor was "faking it" and had no idea what he was doing.

Mr. Carey testified that from 1957 through the fall of 1960 plaintiff's dancing ability did not improve. "She was 68 years old and had gone as far as she would ever go in dancing, thereon it would be merely repetitious." In his opinion "it would take 200 to 400 hours of instructions to teach her to dance in the manner she was dancing in 1960." He also testified that while he was at the studio none of his students ever failed to qualify for any of the medals. When he questioned plaintiff's ability to do the advanced type of dancing she was being sold he was reminded by defendants' manager that he was an employee and that the manager made the rules.

Mr. Carey testified at length as to the attentions, inducements, promises and lies (he said they were) lavished on plaintiff. He became plaintiff's regular instructor. He was about twenty-five years old and apparently quite charming and fascinating to plaintiff. She gave him a diamond ring for his birthday in 1960.

The testimony is rather fantastic but it would unduly extend this opinion to set it forth in greater detail. It was in our opinion sufficient for the jury to find that plaintiff was the victim of a calculated course of intentional misrepresentations.

The charge for instruction varied somewhat up to $10 per hour. After some refunds, and, according to defendants' computation, plaintiff paid approximately $6.75 per hour for 3425 hours of instruction or about $23,000.

If Mr. Carey's estimate of plaintiff's ability and possibility of progress is accepted plaintiff was knowingly overcharged for 3025 hours or a total sum of $20,418.75.

Mr. Carey was discharged by defendants in the fall of 1960.

Plaintiff quit the studio shortly thereafter. She still had 1750 hours of unused time that she had purchased. She testified that she did so because she "was unhappy because things didn't go right and I was through with dancing, and that was the only reason I quit." Defendants' manager testified that plaintiff "became unhappy over the dismissal of Mr. Carey and left the studio." Another witness for defendants said plaintiff complained mostly about losing her instructor, Mr. Carey.

In January 1961 plaintiff employed counsel to represent her in a lawsuit against defendants. Her counsel contacted defendants. Conferences were held. Apparently a divertive campaign was planned by defendants. Mr. Carey testified:

"I next heard from Mr. Theiss in January of 1961 when he called and asked me to come down to the studio to discuss employment. I went to see him and he told me that Mrs. Syester was suing him and wanted to know if I still had any influence over her, to get her to drop the suit. I told him I felt that I still did and I would try to get her to come back to the studio and drop her legal action against him. He said he would reinstate me and pay all of my past due commissions. I accepted the position and went to Bishop's Cafeteria where Mrs. Syester was the coffee girl to see what her feelings were toward the studio. She was very cold toward me and I reported this to Mr. Theiss. He said not to concern myself with the studio, that my job was merely to get her to drop the lawsuit, so I went to Bishops a couple of times a day to try and talk with Mrs. Syester. Finally I succeeded and told her that I was back in the studio and that Mr. Theiss wanted her back. I told her that there would be no hard feelings on our part if she would just drop the suit and come back but she said she did not want to come back to the studio. I continued talking to her and finally got her to accept coming to a party and told her that I would be out to pick her up and escort her to the studio. This was about a week .after I first contacted her, in February of 1961. I told her that I was going to the party and I would save her some waltzes. I knew this was her favorite dance. And I felt that if she would pass up this waltz, she was not interested in dancing. She did not come to the studio so the next day I went down to Bishop's and told her she disappointed

me. very much. Then I started talking about all of the lessons she and I had had and all of the months we had danced and the fun we had together. I told her how wonderful she had done. I painted word pictures and things so she could see this. I asked her if she remembered about when she got the Bronze. She kept saying that was best but all she wanted was her money back. I finally *pur*suaded her to come to the studio and we danced for about 45 minutes. It was at this time that she called the lawsuit off. * * * when I went to Bishop's Cafeteria to see Mrs. Syester I told her she was a good dancer and that she still had the ability to be a professional, excellent dancer. I told her that she did not need an attorney; after all Mr. Theiss and myself were her only friends and we wanted her back at the studio to continue with her Gold Star and reminded her of all the waltzes we would do together."

During the month of February several people contacted plaintiff at the instigation of defendants' manager, including Mr. Carey. These efforts were fruitful. Plaintiff made what defendants claim was a complete settlement. Defendants' counsel prepared a written release (defendants' Exhibit 2) and was present during one conference of the parties. Defendants' counsel did not instigate, carry on, nor make the "settlement" with plaintiff. He testified that he "did not want to get that implicated." In any event defendants' manager at plaintiff's home persuaded plaintiff to discharge her counsel by phone and agree to settle for the refund of her March 2, 1960, payment of $6090. This was reported to defendants' counsel, who, in behalf of his client, wrote settlement checks. Plaintiff's counsel received his share although there is no evidence that the settlement was ever pursuant to his advice. There is evidence that defendants were attempting to lead plaintiff away from her own counsel. Their efforts were so far beyond the limits of propriety that their own counsel hesitated to participate.

The release signed by plaintiff is a specific release of her claim based on the March 2, 1960, payment and a general release of all claims. If obtained in good faith it is a bar to all plaintiff's claims. The release was witnessed by Estella M. Smith, whose identity does not appear, and by defendants' manager.

After signing this release on March 6, 1961, plaintiff's then pending lawsuit was dismissed. Plaintiff returned to the studio and participated in the activities for several months.

A second release dated January 28, 1963, was obtained by defendants' manager. It purports to be a contractual release for $4000. The $4000 to be paid was to be evidenced by a note. There is no claim that anything has been paid thereon. The note provided for installment payments but instead of being signed by defendants it is signed by plaintiff. Defendants' manager testified that this was all a mistake and that the studio was to pay.

Accepting defendants' explanation that it was a mistake the most charitable thing that can be said is that plaintiff would sign anything requested, even a note wherein she was the payee.

The present action was filed March 12, 1963. It alleged fraud and misrepresentation in the several sales to plaintiff and in obtaining dismissal of the previous lawsuit and the releases signed by plaintiff.

Defendants denied any fraud or misrepresentations and urged the releases as a complete defense. Defendants offered evidence in support of their position. At the close of plaintiff's evidence and again at the close of all the evidence defendants moved for a directed verdict. The motions were overruled. The jury returned a verdict for plaintiff in the sum of $14,300 actual damages and $40,000 punitive damages. Defendants appealed.

I. The court told the jury to first consider the issues involved in the releases signed by plaintiff and placed on plaintiff the burden of proving by clear, satisfactory and convincing evidence that they were not binding on her. This was proper.

In five instructions, separately numbered but in sequence, the court instructed on fraud, expression of opinion as distinguished from a statement of fact, fraudulent misrepresentation, intent to mislead, consideration for releases, presumption of freedom from fraud, need for prudence in signing and failure of consideration.

On appeal defendants challenged the sufficiency of the evidence to generate a jury question but not the accuracy of the instructions.

Defendants argue in the absence of fraud the execution of a valid release bars a future action based on the rights relinquished. The rule is stated in Kilby v. Charles City Western Railway Co., 191 Iowa 926, 928, 183 N.W. 371, as follows:

"Where a settlement has been had between competent parties, and a release has been fairly entered into, without fraud or overreaching, it becomes binding and effectual, and will be upheld and enforced. It is undoubtedly the law that an instrument of this character can be impeached for fraud in procuring the same, or where the same was executed by a party who was mentally incompetent to legally execute such an instrument. The burden of proof is on the party seeking to impeach such written instrument."

Mere failure to read an instrument before signing will not avoid its provisions. Crum v. McCollum, 211 Iowa 319, 233 N.W. 678. These propositions are not in dispute and further citation of authority is unnecessary.

Relief from the bar of a release is becoming more liberal even where there is no claim of fraud but only mistake. In Reed v. Harvey, 253 Iowa 10, 17, 110 N.W.2d 442, we quoted from 71 A. L. R.2d as follows:

"There 'appears to be a definite trend in most jurisdictions towards granting relief liberally where it is made to appear that an injured party released his claim under a false impression that he was fully informed as to the nature and extent of his injuries' (page 88 of 71 A. L. R.2d)."

Reed v. Harvey was a tort action but the same rule should apply.

In Christy v. Heil, 255 Iowa 602, 606, 123 N.W.2d 408, a vendor-vendee case, we said: "The trend of recent cases is toward the doctrine that a vendor cannot shield himself from liability by asking the law to condemn the credulity of the purchaser."

The issue involving the releases was essentially factual. That plaintiff was easily influenced appears without question. The consideration for the first release was wholly inadequate. It was only a partial return of an unconscionable overcharge. The consideration for the second release was not paid. The evi-

dence was such that the jury could find that there was such a concerted effort, lacking in propriety, to obtain the releases as to constitute fraudulent overreaching. The jury obviously concluded that there was a predatory play on the vanity and credulity of an old lady. We find no reason for interfering with that conclusion.

II. Defendants argue that "In an action based upon fraud, certain universally recognized elements must be alleged and shown, and the failure to establish any one or more of such elements is fatal to such action." With this statement we agree and so did the trial court. In Instruction No. 10 the jury was told that to recover the burden was on plaintiff to establish by clear, satisfactory and convincing evidence each of the following propositions:

"1. That the defendants made one or more of the representations [claimed by plaintiff] * * *.

"2. That said statements, or one or more of them, were false.

"3. That said false statements or representations were as to material matters with reference to the entering into the lesson contracts.

"4. That the defendants knew the said representations, or one or more of them, were false.

"5. That said representations were made with intent to deceive and defraud the plaintiff.

"6. That the plaintiff believed and relied upon said false representations and would not have entered into the lesson contracts, except for believing and relying upon said misrepresentations.

"7. That the plaintiff was damaged in some amount through relying on said representations.

"If you find that the plaintiff has established each and every one of the foregoing propositions, numbered 1 to 7 inclusive by evidence which is clear, satisfactory and convincing, then your verdict will be for the plaintiff and against the defendants in such amount as you find plaintiff is justly entitled to receive.

"If you find, however, that the plaintiff has failed to establish any one or more of the foregoing propositions, numbered 1 to 7 inclusive, then your verdict will be for the defendants."

The instruction was adequate. Here again the problem was factual. Defendants argue that the representations proved by plaintiff were nothing more than mere expressions of opinion or "puffing" and that the only substantial expression of opinion was in fact accomplished.

In Christy v. Heil, supra, we considered statements of fact as distinguished from opinion or puffing. We said "Ordinarily the question of whether the representations made are opinion or fact is for the jury to determine and depends upon the facts and circumstances in each case." (Citations) Loc. cit. 608 of 255 Iowa. "We must review the evidence in the light most favorable to the purchasers." Loc. cit. 613.

■ Defendants' review of the authorities is exhaustive and scholarly but the fact remains that in the case at bar there was evidence which, if believed by the jury, would support a finding of fraud.

■■ III. Defendants argue that there was no proof of damage. Although the court's instructions on measure of damage were closer to the "out of pocket" rule than to the "benefit of bargain" rule to which we are committed (see 37 C. J. S., Fraud, section 143, page 477) defendants make no complaint. The instruction was not prejudicial to defendants. Defendants say that the rule was properly stated but suggest that the statement of the issues including the amount prayed for may have been misleading. The fact that plaintiff asked for something beyond the correct measure of damage is not reversible error if, as defendants say, the court properly instructed the jury.

■ Defendants argue that there was no evidence from which the jury could find the fair and reasonable value of the instruction received other than the amount paid by plaintiff. Defendants' manager testified that plaintiff still has 899 hours of unused lessons. Mr. Carey's testimony would support a finding that plaintiff was knowingly overcharged for 3025 hours or the sum of $20,418.75. The jury's verdict for $14,300 actual damages was within the evidence. We have no means of knowing just how the jury computed the damage. It was for more than the charge for the unused time according to defendants, but less than would be due for unproductive instruction. In argument defend-

ants have stressed the value of plaintiff's enjoyment. That may have entered into the jury's computation.

The verdict was not beyond the scope of the evidence or the instructions.

IV. In addition to actual damages plaintiff asked for exemplary or punitive damages. The claim was submitted to the jury and a verdict for $40,000 punitive damages was returned.

Defendants argue that the record will not support an award of punitive damages in any amount and that the issue should not have been submitted, but do not challenge the accuracy of the instructions relative thereto.

Defendants argue that in the absence of actual damages, punitive damages cannot be awarded. That proposition is well established and needs no extended discussion here for we have said in Division III, supra, that there was support for an award of actual damages. The rule is stated in 17 Iowa Law Review 413, 414, as follows:

"It is a well settled and almost universally accepted rule in the law of damages that a finding of exemplary damages must be predicated upon a finding of actual damages. The reason for the rule lies in the theory behind exemplary damages, and this theory is ordinarily utilized by the courts in supporting their statements. As indicated by its synonyms, 'exemplary' damages are a species of punishment. They are awarded to the plaintiff in the discretion of the jury as a means of retaliation against the defendant for his anti-social conduct, as a means of preventing him from acting similarly in the future, and as a means of deterring others who might be so inclined. It is argued effectively, therefore, that if no actual damages have been sustained, the defendant merits no harsh treatment, and that there is no foundation on which exemplary damages may be based. * * *."

In the absence of malice, punitive damages cannot be awarded. The problem of what constitutes malice and the evidence necessary to support a finding has been considered in many decisions. The problem frequently arises in actions for libel but comparable confusion arises in other situations. In Ballinger v. Democrat Company, 207 Iowa 576, 578, 223 N.W. 375, the following quotation appears: " 'the word "malice" is the bugbear of the law of libel.' "

Judge Henry Graven in Amos v. Prom, Inc., 115 F. Supp. 127, thoroughly analyzed the rules and supporting authorities incident to exemplary damages. We quote and adopt, but need not repeat, the supporting citations for that opinion.

 "There is no mathematical ratio and exemplary damages may considerably exceed compensatory damages in some cases." Loc. cit. 131.

"Under Iowa law exemplary damages are not a matter of right but rest in the discretion of the jury." (Citations) Loc. cit. 133.

"Exemplary damages may be awarded where it appears that the defendant is guilty of fraud." Ibid.

"Such exemplary damages are permitted on the theory that they serve as a deterrent to wrongdoers and as punishment for wrongdoing." Loc. cit. 134.

Malice or wanton conduct is imputable to the principal. Ibid.

"While it is not entirely clear whether the Iowa decisions regard 'malice in fact' as a descriptive term for 'legal malice' or as a synonym for 'express malice,' it is apparent that the 'malice' required to permit an award of exemplary damages is something less than actual ill-will or express malice and may be termed 'legal malice' for want of a better expression." Loc. cit. 136 of 115 F. Supp.

"It is finally said that the intentional doing of a 'wrongful act' without justification will permit an inference of the wicked state of mind. Yet it is apparent that many wrongful or illegal acts may be intentionally committed from motives wholly apart from any malice or evil intent directed toward the person who happens to suffer by the action, as where defendant is motivated by a desire for gain and has no feeling at all for those injured by him.

 "Therefore, when the law reaches this last stage, as it has in Iowa, it is no longer 'malice' which is required but the 'something else' from which malice is said to be presumed. [Citations] 'It is enough (for legal malice) if it be the result of any improper or sinister motive and in disregard of the rights of others.' 108 N.W. at page 238. The rule would seem to be: exemplary damages may be awarded where defendant acts ma-

liciously, but malice may be inferred where defendant's act is illegal or improper; where the nature of the illegal act is such as to negative any inference of feeling toward the person injured, and is in fact consistent with a complete indifference on the part of defendant, liability for exemplary damages is not based upon the maliciousness of the defendant but is based, rather, upon the separate substantive principle that illegal or improper acts ought to be deterred by the exaction from the defendant of sums over and above the actual damage he has caused." Loc. cit. 136 and 137 of 115 F. Supp.

The jury award of $40,000 was large. However, the evidence of greed and avariciousness on the part of defendants is shocking to our sense of justice as it obviously was to the jury.

The allowance of exemplary damages is wholly within the discretion of the jury where there is a legal basis for the allowance of such damages. We may interfere only where passion and prejudice appear and then only by reversal.

It is not within our power to order a remittitur. Waltham Piano Company v. Freeman, 159 Iowa 567, 571, 141 N.W. 403; Crum v. Walker, 241 Iowa 1173, 1181, 44 N.W.2d 701; Sergeant v. Watson Bros. Transportation Company, 244 Iowa 185, 200, 52 N.W.2d 86.

We think the question of exemplary damages was properly submitted to the jury; that there was evidence to support a verdict; that there is no indication of such passion and prejudice as to require a reversal and that the case should be and hereby is—Affirmed.

GARFIELD, C. J., and HAYS, LARSON, PETERSON, THORNTON and MOORE, JJ., concur.

THOMPSON and STUART, JJ., concur in result.