Tony **HULSTEIN**, Plaintiff
and Appellant,

v.

**MEILMAN FOOD INDUSTRIES, INC.,**
Defendant and Appellee.

No. 12790.

Supreme Court of South Dakota.

Argued April 21, 1980.

Decided June 25, 1980.

Rehearing Denied July 23, 1980.

**890**

John E. Burke, Sioux Falls, for plaintiff and appellant.

Edwin E. Evans and Lawrence L. Piersol of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendant and appellee.

DUNN, Justice.

In an action in the Circuit Court of the Second Judicial Circuit, plaintiff Tony Hulstein received a jury award of $7,000 actual damages and $50,000 punitive damages. The trial court, in response to a motion by defendant Meilman Food Industries, Inc. (Meilman) for judgment n. o. v. or, alternatively, for a new trial, denied the motion for new trial on the condition that Hulstein file a remittitur accepting reduced damages of $4,574.46 actual damages and $5,000 punitive damages. Hulstein refused to accept the reduction in damages, and the trial court entered its order granting a new trial. Hulstein appeals from that order. We reverse the order granting a new trial and remand the matter to the trial court for modification of the judgment in accordance with this decision.

Hulstein operates a cattle feeding business near Sheldon, Iowa. Meilman operates a meat packing plant in Sioux Falls, South Dakota. In late 1973, Hulstein bought about 500 head of cattle from the Flying X Ranch in Montana. In August 1974, he sold some of the cattle to Dubuque Packing Company and received a beef purchase grade and yield slip from Dubuque Packing. The cattle sold to Dubuque Packing were selected at random in order to determine the grade of the cattle.

Shortly after the Dubuque Packing sale, Hulstein contacted Meilman by telephone to inquire if it was interested in buying some of his cattle. He had never sold to Meilman before. Meilman agreed to buy approximately 100 head. The cattle were to be delivered on September 18, 1974, and they were slaughtered on that date. Meilman agreed to pay Hulstein 68 cents per pound for yield grades 1, 2 and 3 in the 500 to 800 pound carcass weight, 65 cents per pound for yield grade 4 in the 500 to 800 pound carcass weight, 55 cents per pound for yield grade 5 in the 500 to 800 pound carcass weight, and $1 was to be discounted on heavier carcasses.

The report Hulstein received from Meilman indicated that there were 47 yield grade 5 carcasses, 40 yield grade 4 carcasses, 8 yield grade 3 carcasses, 2 yield grade good carcasses, and 1 carcass with no grade. On the basis of this grading, Hulstein was paid in excess of $51,000. The Meilman grades were substantially lower than the Dubuque Packing grades. As a result of this discrepancy, Hulstein complained to the Packers and Stockyards Administration on or about September 20, 1974. Hulstein contacted Meilman in an attempt to examine the carcasses, but he was told that they had already been shipped.

The plant manager at Meilman started in that capacity in September 1975, and he

claimed to know nothing about Hulstein's complaint until this suit was commenced. Meilman's treasurer and general counsel also claimed no knowledge of Hulstein's complaint until commencement of this suit. He testified that he knew a government inspector was investigating certain practices at Meilman in 1975 and that because of his position he was interested in the investigation. He testified further, however, that Marshall Churnin, the Meilman vice president, told him "don't worry about it. It's all taken care of."

Samuel Ayres of the Packers and Stockyards Administration came to Sioux Falls to investigate the Hulstein complaint in late 1974 or early 1975. He met with Robert Loge and Marshall Churnin, who were officers and employees of Meilman. Churnin provided Ayres with the books and records relating to the Hulstein transaction. These records revealed that the carcasses of Hulstein's cattle had been sold at grades higher than those reported to Hulstein. Ayres calculated that Hulstein had been undercompensated in the amount of $3,535.04. Upon completion of the audit, Ayres told Churnin that the accounting had been incorrect, but in discussions with Ayres and Meilman's general counsel, Churnin maintained that the accounting was correct.

In February 1979—just before trial—Meilman's general counsel authorized payment of $3,534.08, plus $500 for attorney fees, to Hulstein. He testified that the 1974 report and payment to Hulstein were "done not to hurt Mr. Hulstein," but he also testified that the inaccurate report and underpayment were neither accidental nor inadvertent; they were deliberate. He testified that he realized that there was a discrepancy after the lawsuit was started, but Meilman's documentation with regard to the Hulstein transaction had been lost. Hulstein refused this settlement offer.

■ The first issue we must address is the propriety of the trial court's action in reducing the actual damages. In the absence of a clear abuse of discretion, the granting of a new trial based upon an excessive award of compensatory damages should not be reversed on appeal. *Simpson v. Union Oil Company*, 411 F.2d 897 (9th Cir. 1969), reversed on other grounds, 396 U.S. 13, 90 S.Ct. 30, 24 L.Ed.2d 13 (1969); *Taylor v. Washington Terminal Company*, 409 F.2d 145 (D.C.Cir. 1969). The sole object of compensatory damages is to make the injured party whole. *Ralston Purina Co. v. Jungers*, 86 S.D. 583, 199 N.W.2d 600 (1972).

■ In the instant case, it was undisputed that the actual loss sustained by Hulstein was no more than $3,535.04. In an attempt to justify the jury verdict of $7,000 in compensatory damages, Hulstein argues that the difference between the actual loss and the award constitutes prejudgment interest. Under this assumption, however, the annual interest rate would exceed twenty-one percent. With certain exceptions not applicable here, SDCL 54–3–5 specifically limits prejudgment interest to six percent per annum. It is clear that the $7,000 jury verdict is in violation of South Dakota law. The trial court acted properly in reducing the compensatory damages to a figure representing six percent prejudgment interest.

■ Hulstein's citation to SDCL 54–3–7.1 in this regard is inapposite. This section, which allows a corporation to "agree to pay any rate of interest in excess of the maximum rate provided in §§ 54–3–5 and 54–3–7," only applies where a corporation voluntarily agrees to pay a higher interest rate. Meilman has never agreed to do so in this case.

The next issue concerns the trial court's reduction of punitive damages. After properly reducing the compensatory damage award to $4,574.46, we find that the $50,000 punitive damage award is about eleven times the compensatory damages. We are mindful of our statement in *Stene v. Hillgren*, 77 S.D. 165, 88 N.W.2d 109 (1958), that the trial court has wide discretion in granting a new trial based upon excessive damages. We find, however, that the trial court was not justified in reducing the punitive damages.

The purpose of awarding punitive damages is to punish the wrongdoer. There is no precise mathematical ratio between compensatory and punitive damages. *Syester v. Banta*, 257 Iowa 613, 133 N.W.2d 666 (1965). The allowance and amount of punitive damages turns on the particular facts of each case. *Claude v. Weaver Construction Company*, 261 Iowa 1225, 158 N.W.2d 139 (1968). Punitive damages must not be oppressive or so large as to shock the sense of fair-minded men, *Oppenhuizen v. Wennersten*, 2 Mich.App. 288, 139 N.W.2d 765 (1966), but they may considerably exceed compensatory damages. *Syester v. Banta*, supra. To accomplish the objective of punishing the wrongdoer and deterring others from similar wrongdoing, punitive damages must be relatively large. *Northrup v. Miles Homes, Inc. of Iowa*, 204 N.W.2d 850 (Iowa 1973). The amount allowed in compensatory damages is but one of the circumstances to consider regarding the proper amount of punitive damages. *Baumgartner's Electric Const. Co. v. DeVries*, 77 S.D. 273, 91 N.W.2d 663 (1958). Other factors that properly have a bearing upon the amount of punitive damages are the nature and enormity of the wrong, the intent of the wrongdoer, his financial condition, and all of the circumstances attendant to his actions. *Baumgartner's Electric Const. Co. v. DeVries*, supra.

With regard to the financial condition of Meilman, there was a certain amount of evidence before the jury on this topic. Hulstein received in excess of $50,000 for his 100 head of cattle. Testimony by Meilman's plant manager indicated that 550 to 650 cattle were slaughtered daily by Meilman when he began working for it in 1975. The jury was thus made aware that Meilman was a business entity of substantial proportion.

The trial court properly instructed the jury that there must be a finding of fraud on the part of Meilman before punitive damages could be awarded. *Syester v. Banta*, supra. We find that there was sufficient evidence for the jury to find that Meilman's actions were fraudulent. It was established at trial that Meilman's actions were deliberate and not the result of accident or inadvertence. Meilman knew of the discrepancy very soon after it happened, and yet it persisted in the deception. Meilman denied wrongdoing to the federal inspector. Meilman's records of this transaction were thereupon lost and not reconstructed until after this lawsuit began, about four years later. In addition, testimony at trial indicated that there were several other existing complaints against Meilman at the time Hulstein registered his complaint.

In sum, the brazen manner in which Meilman deliberately cheated Hulstein and its continued deception by "losing" the records of the transaction apparently convinced the jury that a large monetary penalty was necessary. With regard to the proper amount of punitive damages, we are mindful that each case turns on its own set of circumstances. The particulars of this case simply demand that the penalty imposed be large enough to effectuate the purpose of punitive damages, i. e., punishment of the wrongdoer. Under these circumstances, we do not find the $50,000 punitive damage award to be improper or to be in such an amount as would indicate such passion and prejudice that a remittitur is warranted. Instead, this award should be a clear signal that companies caught practicing deliberate fraud will be severely punished. This is the purpose of punitive damages.

The order granting a new trial is reversed, and the case is remanded to the trial court with instructions to enter judgment for the plaintiff in the amount of $4,574.46 compensatory damages and reinstate the jury verdict and judgment of $50,000 in punitive damages.*

---

* The fact that Hulstein only requested $25,000 in his ad damnum does not prevent us from approving the jury award of $50,000 in punitive damages. This point was not argued by Meilman in its appeal brief or in the motion for judgment n. o. v. at the trial court level. The matter was discussed briefly during oral argument simply in response to a question from the court. Meilman's counsel conceded in oral argument that the ad damnum request was not a legal bar to an award in excess of $25,000.

WOLLMAN, C. J., and MORGAN and HENDERSON, JJ., concur.

FOSHEIM, J., concurs in part and dissents in part.

FOSHEIM, Justice (concurring in part, dissenting in part).

I concur with the majority opinion regarding the compensatory damages award. However, reinstating the $50,000 punitive damage award seems excessive, particularly since plaintiff's ad damnum seeks only $25,000.

In my opinion, the Court should not endeavor to punish to a degree greater than plaintiff requested. I would allow punitive damages of $25,000.