STATE OF IOWA ex rel. W. L. BIERRING, Commissioner of Public Health, Appellee, v. SOPHIE RITHOLZ et al., Appellants.

No. 44401.

JANUARY 10, 1939.

REHEARING DENIED MAY 5, 1939.

Sam Abramson and Sam G. Pickus, for appellants.

John H. Mitchell, Attorney General, Don W. Burington, Asst. Attorney General, and Carl A. Burkman, County Attorney, for appellee.

Herbert H. Hauge, Amicus Curiae.

STIGER, J.—In this suit plaintiff sought an injunction against defendants restraining them from practicing optometry without a license. Plaintiff alleged in its petition that defendants through employees professed to be optometrists, skilled in the ocular science, and, through the employees, practiced optometry in contravention of the provisions of chapters 116 and 122, sections 2538 et seq., 2574 et seq., Code of Iowa, 1935, and that defendants are not licensed to practice optometry in the state of Iowa.

Defendants specifically denied that they held themselves out to be optometrists; that they were engaged in the practice of optometry; that they employed a physician for the purpose of making ocular examinations and that the business conducted by defendants does not constitute the business of optometry. Defendants admit that they are not licensed to practice optome-

try and affirmatively allege that their business consists of selling eyeglasses or spectacles by filling prescriptions which prescriptions are prescribed by persons authorized under the laws of the state of Iowa and that the business carried on by defendants does not constitute the practice of optometry.

The trial court found for plaintiff and a decree was entered restraining and permanently enjoining defendants from the practice of optometry without a license in the state of Iowa, either directly or indirectly, either by themselves, agents, or employees.

Code section 2439 provides that no person shall engage in the practice of optometry unless he shall have obtained from the state department of health a license for that purpose.

Optometry is defined by statute as follows:

"2574. Optometry defined. For the purpose of this title the following classes of persons shall be deemed to be engaged in the practice of optometry:

"1. Persons who employ any means other than drugs for the measurement of the powers of vision of the human eyes, and adapt lenses for aiding the same.

"2. Persons who allow the public to use any mechanical device for such purpose.

"3. Persons who publicly profess to be optometrists and to assume the duties incident to said profession."

Licensed physicians and surgeons may practice optometry without a license. Code section 2575.

The sole question presented on this appeal is whether defendants were engaged in the practice of optometry as defined by section 2574.

Plaintiff seeks to sustain the decree on the ground that the arrangement entered into between appellants and the physicians constitutes an employment agreement and that the employment of one legally authorized to practice optometry in the state of Iowa by an unlicensed person or corporation is prohibited by statute. It is conceded that all persons with whom defendants had an arrangement or contract for the practice of optometry were licensed physicians and surgeons.

We shall first consider plaintiff's contention that the arrangement between defendants and the physicians constituted the relation of employer and employee. The record discloses

the following arrangement between defendants and the physicians: The business of defendants consisted of selling eyeglasses or spectacles by filling prescriptions prescribed by authorized persons and selling optical merchandise. Defendants were opticians. In Des Moines, they carried on their business in the Insurance Exchange building. Their practice was to rent an office consisting of one or more rooms adjacent to the rooms in which they carried on their business and to arrange with a licensed physician to occupy such rooms and practice optometry. Defendants paid the rent, light, heat and telephone bills, and furnished all the equipment used by optometrists in examining and testing eyes. The examination fees charged by the physician, which ranged from $1 to $2, belonged to him. None of the earnings of the doctor belonged to or was paid to the defendants. Defendants, however, guaranteed the physician that his earnings would be $40 a week. If the earnings were under $40 a week they would pay him the difference. While there is some testimony to the effect that the physician was not obligated to send patients with the prescription to defendants, we are convinced that the real arrangement was that defendants would send all persons who came to their establishment without a prescription, and who desired glasses, to the physician and the physician was to direct his patient to the defendants for the purpose of having his prescription filled.

Dr. Hamilton, one of the physicians who had such an arrangement with the defendants, testified for the plaintiff. He testified:

"My name was on the door of my office as 'Dr. S. M. Hamilton'. My time was my own. I had no particular office hours. I had full charge, supervision and direction of my office. I had full charge and direction of my patients that came to me. Nobody interfered with my prescriptions. No member of the National Optical Stores Company, neither manager, agent or any other employee told me what to prescribe for my patients. They had no supervision or control of the operation of my business. I charged my patients fees for examining their eyes and prescribing for them. I did not share or divide those fees with anyone. Some weeks I took in as much as $63.00. I had a key to my office. I did not have a key to the offices of the National

Optical Stores. All during the arrangement with defendants I was practicing medicine, surgery and optometry.''

Dr. Payne, another licensed physician who had the financial arrangement with the defendants heretofore described for a period of 10 days, testified:

''I had more than 40 patients each week the weeks I worked there. Mr. Tostesen told me what to do. He gave me instructions in regard to fitting the eyes. He said to rush them up as fast as I possibly could and get through with them as soon as I possibly could. I was told by Tostesen to be in my office from nine in the morning until as long as work lasted in the evening. Mr. Tostesen helped in the examination himself. He was there (at the Des Moines' office) about 5 days. I think he came in when I was rushed to try to rush things up a bit thinking I was a little slow.''

We are satisfied Tostesen did not have the right to control and did not control the examinations or prescriptions, and did not influence Dr. Payne.

Dr. Payne testified:

''I made all of the examinations. I wouldn't pay any attention to him. I wrote the prescriptions on whatever tests he made.''

Tostesen was a salesman employed by defendants to sell glasses and manage its business. He knew nothing of optometry. He testified he never attempted to examine the eyes of anyone, that as manager of the business of the defendants he would refer all persons to the physicians for examinations.

Dr. Gasson, a licensed physician, who had the same arrangement with defendants in Sioux City as Payne and Hamilton had in Des Moines, also testified for the State. The witness testified that on one occasion he tested the eyes of a patient and found his glasses did not need changing and he was criticized for not changing the glasses. He also testified that one of defendants' salesmen suggested to him that, after he had refracted a patient, he place on the prescription a bogus prescription indicated by drawing a light line around it ''so that I can see it and use it as a talking point to get more money out of the patients, more money for the glasses''. The witness replied, ''I never did any-

thing of that kind and I am not doing it now.'' The State especially relies on the above testimony in its effort to establish its theory that defendants controlled the physician in making examinations. On cross-examination this witness testified:

''I placed a bogus prescription on there with the understanding with the salesman that he would use that as a talking point to sell glasses but the patient got the glass I prescribed. However, as far as the prescription was concerned, the glasses were the glasses required as per my prescription. I could quit the arrangement any time, any day, any week, any month.''

By this statement on cross-examination, the witness admitted the defendants did not attempt to influence the prescription from which the glasses were ground, and that the only purpose of the bogus prescription was to enable defendants to get more money from the patients.

The testimony of this witness shows that he had an unfriendly feeling towards the defendants. He had been absent from the office for an appreciable length of time on account of sickness and upon his recovery defendants refused to continue the arrangement. He testified on cross-examination:

''I came here yesterday of my own free will and accord. I was not sent for. I went to the authorities myself. I went to Mr. Carlson. I did not *necessarily* tell him that I wanted to testify against the National Optical Stores Company. I did go last week to Mr. Geldon, the Sioux City manager for the National Optical Stores Company, and asked him if they had any use for me and they said they didn't have any more use for me. That is why I went down to tell the authorities and Mr. Carlson. If they had told me that they wanted to resume the arrangement I would not have come to Mr. Carlson and told him all about this at this time, but I would sometime.''

We do not believe this physician and surgeon, a member of one of the most respected, ethical and learned professions, would have sought to continue the arrangement if defendants had been guilty of the unethical and reprehensible conduct he ascribes to them. If his testimony is true, he was a willing party to the fraud. But, in any event, the prescription filled was the prescription of the witness and not of the defendants.

Plaintiff failed to establish its contention that the rela-

tionship of employer and employee existed between the defendants and the physicians. No witness testified for the plaintiff that the defendants under the arrangement had the right to control or influence a physician in making the examination. Dr. Hamilton testified that there was nothing in the arrangement that gave defendants control of the operation of his business. Dr. Payne testified that he paid no attention to suggestions made by employees of defendants. Three managers of the business of defendants testified that neither the defendants nor their employees tested eyes or wrote prescriptions and that persons coming to the place of business of the defendants would be referred to the physicians for examination and when the prescriptions were brought to the office of defendants by the patients they would have the lens ground according to the prescription. All of these witnesses testified that defendants did not influence or coerce the physicians in making prescriptions or in refracting.

This court has repeatedly held that the test of the employer-employee relation is the right of the employer to exercise control of the details and method of performing the work. We find that the defendants under the arrangement did not have the right to control or seek to control examinations of eyes by the physicians. The physicians, all of whom had practiced optometry prior to the arrangement, were not performing the business of defendants but were carrying on their own business of optometry under a reciprocal arrangement with the defendants for the mutual financial benefit of both parties. When a patient came to consult one of these physicians there was the personal relationship of patient and physician between them. The physicians, in making the refraction, represented the patient and not the defendants.

As stated by Mr. Weiss, one of the defendants, "the arrangement was both beneficial to the doctors and the National Optical Stores Company. The company was a general optical company that would grind and furnish any kind of lens in any kind of frames; that is what the company did. The more prescriptions written by the doctors, the more glasses we could sell. Such an arrangement as we had (with reference to the physicians referring patients to defendants for the purpose of having their prescriptions filled) is practically had by every dispensing optician. In order to get more customers to come to my office, the closer the doctor is, the more apt the patient is to come to

me. It is true that a lot of these doctors and physicians and optometrists refer their work to one institution, dispensing opticians. The more physicians or opticians that you can have that would make that arrangement, the more business you would do. I visited with Dr. Hamilton in his office but never attempted to show him as to what he should do in taking measurements. I had no control over him in that regard. I had no supervision over him of any kind.''

█ The record shows that the business of defendants was materially increased by the arrangement. We are satisfied after a careful reading of the record that defendants did not coerce or influence the physicians relative to prescriptions. The profession of the physicians and the business of defendants were separate and each operated independently of the other. We hold that the defendants did not practice optometry as defined by section 2574.

The trial court stated in the decree that the case was controlled by the case of State v. Kindy Optical Company, 216 Iowa 1157, 248 N. W. 332. The facts in the Kindy case distinguish it from the case at bar. In the Kindy case the licensed optometrist was an employee of the defendant. He was paid a monthly salary, and all of his earnings belonged to the company. The employee was subject to the control and direction of the defendant in *all* things. The court found that through its method of advertising it specifically professed to carry on the business of optometry. The court held that the purpose of the statute was to protect the public from incompetent and unscrupulous practitioners; that the law contemplated and required that the relation of the doctor to the patient must be a personal one; that the optometrist, being the employee of the defendant, was not personally practicing his profession but that defendant was practicing optometry through its employee. Because of the substantial difference in the facts, the Kindy case does not control the decision in this case.

█ Defendants urge the proposition that the employment of one legally authorized to practice optometry in the State of Iowa is not forbidden by statute, and even if the arrangement did constitute an employment contract, the same did not constitute the practice of optometry by the defendants in violation of the laws of the State of Iowa, and the court erred in so holding, and state in argument:

"We feel that the Kindy case is contrary to the great weight of authority as evidenced by recent decisions of courts rendered since the Kindy case, is not sound and should be overruled."

They cite, among others, the following cases: Georgia Board v. Friedman Jewelers, 183 Ga. 669, 189 S. E. 238; Golding v. Schubach Optical Co., 93 Utah 32, 70 P. 2d 871; Jaeckle v. Bamberger, 119 N. J. Eq. 126, 181 A. 181.

The statutes construed by the court in the Jaeckle case are materially different from those involved here, and in the other cases cited the courts reached the same result but on different principles.

In the case of Georgia Board v. Friedman Jewelers, supra, the defendant corporation employed a licensed optometrist. The court, after holding that optometry was not a learned profession and that the sole purpose of statutes regulating the practice of optometry was to protect the public health and prevent unskillful examinations of eyes, stated:

"This being so, we see no reason why the corporation in the present case by employing a qualified and licensed optometrist is practicing optometry contrary to the provisions of the statutes or that its acts under such circumstances will so endanger the public health and safety as to thwart the purposes of the statutes."

In the case of Golding v. Schubach Optical Company, supra, the court held that there was nothing in the statutes making employment of licensed optometrists by a corporation or unlicensed persons unlawful or against public policy and that the right of a person to sell his time and talents is as inalienable as the right of the owner of other property to contract respecting thereto subject to reasonable police regulations.

The conclusions reached by the above cases are not in harmony with the decisions of this court.

Because of our holding that the relationship existing between defendants and the physicians was not one of employer and employee it will not be necessary to consider this proposition further than to say that we are satisfied with the conclusions reached in the cases of State v. Kindy Optical Company, 216 Iowa 1157, 248 N. W. 332, and State v. Bailey Dental Com-

pany, 211 Iowa 781, 234 N. W. 260, and reaffirm the interpretation placed on our statutes and the principles announced ·in those cases.

The case is reversed and remanded and the trial court is directed to enter a decree in harmony with this opinion and dismissing plaintiff's petition.—Reversed and remanded.

MITCHELL, C. J., and SAGER, OLIVER, BLISS, HALE, and MILLER, JJ., concur.

RICHARDS, J., dissents.