RAY CRUM, appellee, v. CHARLES O. WALKER et al., appellants.

No. 47708.

(Reported in 44 N.W.2d 701)

NOVEMBER 14, 1950.

Vernon P. Long and Richards & Richards, all of Red Oak, for appellants.

Earl C. Fishbaugh, Jr., of Shenandoah, and Billings & Swanson, of Red Oak, for appellee.

SMITH, J.—Plaintiff, a café employee from Shenandoah, Iowa, shortly after midnight, April 26, 1946, while in Red Oak, Iowa, entered Dreamland, a restaurant owned and operated by defendants Charles O. and Margaret Walker. He was accompanied by Dale Irwin. They sat on lunch-counter stools and were waited on by defendant Harry Walker, son of his codefendants. The alleged assault and battery was committed by Harry Walker who struck plaintiff on the head with a 7-Up bottle.

Plaintiff brought this action and was awarded by the jury actual damages in the sum of $1500 and exemplary damages $2500, the exact amounts prayed for. Defendants appeal.

Practically all witnesses on both sides testify defendant Harry Walker struck plaintiff on the head with a bottle of 7-Up. Plaintiff's testimony was to the effect that just before the assault

he looked up from his sandwich and saw Harry staring at him "pretty hard, so I just looked back at him for a couple of minutes. He came back over and said, 'I don't like the way you look at me.' I told him I couldn't help how I look." Harry then struck him with the bottle.

His testimony is substantially corroborated by his companion, Irwin, and witnesses Jones, Allely, and Betty Hood. Allely, who sat at the same counter with plaintiff with two empty seats between them, says:

"I was sitting there and looked up and saw that Walker was staring at Crum and Crum was staring back at Walker. Then Walker walked back there to Crum and said something to the effect 'Don't look at me like that, I am a big man.' Crum then made the statement, 'I can't help how I look.' Then Harry Walker took the bottle of 7-Up that was sitting in front of Crum and hit him over the head with it. * * * Harry Walker appeared to be very angry. He said nothing at the time he hit Crum. * * * the bottle was broken and the contents were all over Crum. * * * there was no blood for a second or two and then it spurted all at once * * *. Crum fell off the stool * * * appeared dazed."

Betty Hood's account is not materially different. She says, "There was no intervening stool between me and where Crum sat." She says when plaintiff came in and greeted Harry as " 'Hi, Joe' or 'Hi,' something like that," Harry replied, " 'If you don't know my name you don't need to speak to me.' " Her account of the staring episode gives plaintiff's reply as ." 'Well, God gave me two good eyes and I could look at anyone I pleased.' " She adds, "The first thing I knew after that, Harry had hit him with the 7-Up bottle."

Defendants and their witness Finchem, an employee, identify plaintiff as the one who was allergic to being stared at and Harry as the one asserting his God-given right to stare where he pleased, an addition perhaps to the "Four Freedoms."

Defendants also testify that before he was struck plaintiff started over the counter after Harry, implying Harry struck in self-defense. They also say plaintiff and Irwin were drunk and loud and boisterous from the time they came into the place and were using profane and obscene language, particularly of-

fensive to ladies. The one lady who testified, other than defendant Margaret, denies all this testimony as do plaintiff's other witnesses.

All witnesses seem to agree there was some slight earlier disagreement over the making of change when plaintiff paid his bill after being served and before the "staring" started the hostilities. Apparently this was amicably settled and had no connection with the assault.

There is also dispute between the respective camps of witnesses as to whether the bottle broke when it struck plaintiff's head and whether plaintiff fell to the floor.

One Sadler, a self-styled "merchant policeman", was a witness for defendants. He was in Dreamland "at the time of the episode between Ray Crum and Harry Walker." However, he was talking to defendant Charles O. Walker and says he did not see the blow struck. "I was not paying attention to what was going on. After Crum got hit, Harry Walker told me to take Mr. Crum outside and I proceeded to do it." The witness is very vague as to what Crum said but thinks it was something about going back and killing Harry.

Evidently this peace officer (if that is what a "merchant policeman" is) did not hear any such ribald talk and disorderliness on the part of plaintiff or see any threatened attack by him on Harry as is described by defendants and Finchem. Nor, so far as the record shows, did he arrest Harry. Instead, after the assault, he obeyed the order of the assailant to remove the victim from the room.

Eleven errors are assigned on appeal but they overlap and duplicate and may be discussed under a few propositions. The jury evidently resolved the conflicts in testimony in plaintiff's favor.

I. We mention first the contention that defendants Charles O. and Margaret Walker are not shown liable for their son Harry's conduct (1) because he was not an employee, or at least (2) because he ceased to be an employee the instant he went beyond the scope of his employment and struck plaintiff. The propositions are properly raised by motions to direct, requests for and objections to instructions and motion for new trial.

As to both propositions the decision must be against defendants on the record. One witness testifies Harry "was waiting on customers, taking orders, collecting the money, and acting as head check person, and he took the money that was paid to let people in the back room. The door into the back room was unlocked when he rang the buzzer." This witness had lived in Red Oak practically all her life and says she had been in Dreamland two dozen times. Another witness corroborates this who testifies he had been in the place ten or twelve times. "Charles Walker was in the back room most of the time, Harry Walker in the front room."

Defendant Harry himself testifies:

"Ever since Dreamland was constructed in 1941 I have been with my father and mother. During all that time I worked as a member of the family. I wait on tables, permit people to go into the back room, make a charge, following the instructions given me by my father and mother more or less. In other words it was my father and mother I was working for, they designated and told me what I was to do in there and the nature of my duties. * * * I maintain proper order, at times in conjunction with my father, I hereby conduct the business and maintain order."

He testifies he is thirty-seven years old, six feet one inch tall and weighs two hundred eighty-five pounds; that he has a somewhat crippled leg from a boyhood injury; that otherwise he is well and works about twelve hours a day. "I am on duty practically all of the time, and practically all day. I run the front end of the restaurant, where the affray took place."

On redirect examination, in response to a leading question, he explained that when he said on cross-examination he worked *for* his father and mother he meant he worked *with* them "as one of the family and not as an employee."

This last testimony fairly reveals one of defendant's contentions that Harry was not a servant in such sense as to invoke or authorize application of the doctrine of respondeat superior. They claim because they paid their son no definite, stated amount of wages and had no express contract with him they were not liable for his acts.

■ While we find no case factually in point, the language of our opinions and the logical theory of the doctrine itself deny. their contention. In a quite early case we quoted with approval 1 Parsons on Contracts 88: "The responsibility of the master grows out of, is measured by, and begins and ends with his control of the servant." Callahan v. Burlington & Missouri River R. Co., 23 Iowa 562, 564. In that case the question was whether the one committing the alleged tort was a servant or an independent contractor. That is the way it usually arises. In that case the opinion proceeds, still citing if not quoting Parsons:

"If the person sought to be charged * * * did not contract with the party committing the wrongful act for his labor or services, and is not directly liable to him for compensation * * * and has no such control over him as will enable the employer to direct the manner of performing the labor or services, he is not liable * * *. In order to create the liability it is especially necessary that the control * * * should be of such a character as to enable him to direct the manner of performing the services, and to prescribe what particular acts shall be done in order to accomplish the end intended."

We find no departure from this test in our later cases. See Kanipe v. Grundy County Rural Elec. Co-op., 231 Iowa 187, 300 N.W. 662; Grismore v. Consolidated Products Co., 232 Iowa 328, 5 N.W.2d 646; Anderson v. Abramson, 234 Iowa 792, 13 N.W.2d 315. See also 57 C. J. S., Master and Servant, section 563b, page 276 et seq.; 35 Am. Jur., Master and Servant, section 3.

■ The payment of or right to collect wages is not essential to the existence of the relationship. It is sufficient if there be a lawful consideration for the contract of employment. 35 Am. Jur., Master and Servant, section 12; 57 C. J. S., Master and Servant, section 563d, page 279 et seq.; Aga v. Harbach, 127 Iowa 144, 102 N.W. 833, 109 Am. St. Rep. 377, 4 Ann. Cas. 441. Nor is an express contract of employment necessary to create the relationship. It may be implied from the general conduct of the parties in relation to the business. Aga v. Harbach, supra, 127 Iowa at pages 147, 148; 35 Am. Jur., Master and Servant,

section 9, notes 4, 5; 57 C. J. S., Master and Servant, section 563c, notes 48–51.

It is earnestly argued that Harry was not an employee but a legally dependent person (under sections 252.1 and 252.2, I. C. A.) due to the crippled condition of his leg; that he had tried but had been unable to make a living by working for others; that he has been in the hospital; but that excepting for a few months he has lived at home all his life.

■ Assuming without deciding that this would, if established, preclude an application of the doctrine of respondeat superior, we cannot hold as a matter of law under this record that there was no question for the jury. It was still a fact question. Nor did any requested instruction raise the question of Harry's dependency. The first suggestion of that kind is found in appellants' argument on appeal.

■ II. But defendants argue the evidence shows as a matter of law that defendant Harry Walker stepped out of his role as employee when he attacked plaintiff. It is of course true he cannot be said to have been employed to commit assault and battery upon his customers. But it has been said, "The mere fact that a servant is not employed to be negligent does not mean that such tortious acts are outside the scope or course of his employment * * *. On the other hand, it is not sufficient * * * that the acts were performed during the period of employment." 57 C. J. S., Master and Servant, section 571, pages 317, 318.

This court has said the tendency of courts has at all times been to resolve doubts against the employer in this class of cases to the extent, at least, of submitting the question as one of fact to the jury. Johnson v. Chicago, R. I. & P. Ry. Co., 157 Iowa 738, 744, 141 N.W. 430, L. R. A. 1916F 945. And that where the employer owes "an affirmative duty of protecting a party from injury, as a passenger upon a railway train, an occupant of a sleeping car, a guest of an inn, or any other person to whom the master owes an affirmative duty of protection, he is responsible for the wrongful, malicious, or tortious acts of his servants, although not done in the course of their employment." Nesbit v. Chicago, R. I. & P. Ry. Co., 163 Iowa 39, 50, 143 N.W. 1114. See also Dilli v. Johnson, 71 App. D. C. 139, 107 F.2d 669.

Harry himself testified it was a part of his duty "in conjunction with my father" to maintain proper order. Plaintiff was a guest and entitled to protection. The other defendants were present at least part of the time. They did not repudiate their son's conduct but they attempt, by their testimony, to defend it.

■ The instructions bearing on the issue of respondeat superior are too long to set out in full. Particular criticism is leveled at one sentence which was to the effect that if Harry began a quarrel with plaintiff while acting within the scope of his employment and immediately followed it up by the assault in question the employing defendants would be liable "as the law under such circumstances will not undertake to say when in the course of the assault he ceased to act as employee or servant and acted upon his own responsibility." The converse was also carefully stated.

The quoted part of the instruction merely states the proposition that if the servant up to a certain point in the altercation is within the scope of his employment, the law will attempt no fine distinction as to the exact moment he goes beyond it. Harry not only testifies plaintiff and Irwin were "loud and boisterous and were intoxicated," but he says Crum addressed language to Irwin that was "obscene and vulgar. * * * I told Crum he would have to cut out that language or leave." The clear implication of Harry's whole testimony is that he had authority to maintain order and to eject plaintiff if necessary. He claims he forbade any "spiking" of the 7-Up with whisky. "In reply Crum asked what kind of a God damn joint we were running there. This was in a loud tone of voice. I told him he would have to quit, stop that language, either that or get out."

We find no error in the instruction complained of. It is supported by our decision in the Nesbit case, supra (163 Iowa 39), and the authorities therein cited.

■ III. Defendants complain that the damages allowed are excessive. The contention is well-founded. We can find no justification for a verdict of $1500 for compensatory damages under this record. It is to be conceded that "ordinarily, the assessment of unliquidated damages is peculiarly within the discretion of the jury." Remer v. Takin Bros. Freight Lines, Inc., 230 Iowa

290, 294, 297 N.W. 297. But the cited case and the authorities therein referred to concede this discretion is not unlimited and that if the verdict be such as to shock the conscience it is the court's duty to set it aside.

Were this the whole situation here we would not hesitate to do this, granting plaintiff an election to accept a reduced amount in lieu of a new trial.

It is clear plaintiff's pain was of comparatively short duration and degree. He was taken to the hospital in Red Oak, a nurse washed the blood from his hair and a doctor took two stitches in his head and charged him $7.00, his total expense. He returned to Shenandoah that same night and went to bed.

He lost no time. He testified: "The next day I went to work, I just worked very little because every time I had to pick something up I got dizzy. The next day the wound caused me considerable pain." He worked continuously thereafter.

The only testimony as to "mental anguish" is his answer when he was asked by his attorney: "Q. Well now, did the blow you were hit with such violence, in a public place, cause you any mental anguish, shock? A. Well, yes, to a certain extent."

Taking into account the time and place and circumstances the answer is explainable.

But our problem here concerns a further allowance of $2500 for exemplary damages. This we cannot permit to stand. It is out of all proportion to the actual damage sustained, the circumstances of the assault and the gravity of the crime involved. As to this part of the verdict we are without authority except to reverse the case. Ahrens v. Fenton, 138 Iowa 559, 562, 115 N.W. 233; Saunders v. Mullen, 66 Iowa 728, 24 N.W. 529; Waltham Piano Co. v. Freeman, 159 Iowa 567, 571, 141 N.W. 403; Wildeboer v. Petersen, 182 Iowa 1185, 166 N.W. 464; Cain v. Osler, 168 Iowa 59, 67, 150 N.W. 17, Ann. Cas. 1918C 1126.

In one of the cited cases we said:

"But as the allowance of exemplary damages is wholly within the discretion of the jury in a case where there is a legal basis for the allowance of such damages (Reizenstein v. Clark, 104 Iowa 287), the finding of the jury can only be interfered with on the ground of such error of judgment as to indicate passion and prejudice, and where the allowance is so grossly

excessive under the evidence that it should not be allowed to stand, the verdict should be set aside." Ahrens v. Fenton, supra.

In a later case it was said: "As all the damages awarded on the counterclaims in excess of $296.44 were exemplary, the verdict cannot be cured by remittitur." Waltham Piano Co. v. Freeman, supra.

Under the record we are compelled to reverse, however desirable it might be to make it possible, by remittitur, to avoid another trial. The judgment is accordingly—Reversed.

All JUSTICES concur except HALE, J., not sitting.