Rodney BENGFORD, Minor, by Raymond Bengford, his Father and next friend, Appellee,

v.

CARLEM CORPORATION, a Corporation, and Ford Motor Company, a Corporation, Appellants.

No. 52535.

Supreme Court of Iowa.

March 5, 1968.

Rehearing Denied May 7, 1968.

. Shull, Marshall, Mayne, Marks & Vizintos, Sioux City, for appellants.

Thomas L. McCullough, Sac City, and Daniel Williamson, Earley, for appellee.

MOORE, Justice.

On July 29, 1964 plaintiff, Rodney Bengford, then age 9, lost his right leg below the knee when he became entangled in the augers of a Heider Grain-O-Vator wagon being used by his father on the farm of his employer Carlem Corporation. A Ford tractor designed, manufactured and sold by Ford Motor Company, was attached to the wagon and propelled the augers.

This is an appeal from judgment on jury verdict for plaintiff's damages against the farm owner and operator, Carlem Corporation, based on alleged negligence in furnishing defective farm machinery and against Ford Motor Company. Plaintiff's action against Ford is based on negligence and also breach of implied warranty.

The relatively recent development in the law, the doctrine of strict liability, which has been adopted as against manufacturers by several other jurisdictions is not pleaded in this case and therefore is not now considered by us.

The primary contention of each defendant is the trial court erred in overruling the motions for directed verdict and judgment notwithstanding the verdict. They also contend the court erred in admitting certain evidence, overruling their objections and exceptions to instructions and sustaining plaintiff's objections to interrogatories filed by defendants prior to trial.

After being employed as a farm hand by defendant, Carlem Corporation, Raymond Bengford, his wife and five children on December 1, 1963 moved upon Carlem's 120 acre farm and began operating it together with a 160 acre tract rented by Carlem. The equipment furnished by Carlem included a Ford 6000 diesel tractor which Carlem purchased about the same time Bengford was hired. Paul Viet, one of the three Carlem stockholders, hired Bengford, bought the Ford tractor and was in general charge of Carlem's interest. He visited the farm about once a week.

Bengford used the Ford tractor for various farm jobs during the first few months of his employment but did not use it in conjunction with the Grain-O-Vator wagon until about a month before Rodney's injury. As is customary, other members of the family, including Mrs. Bengford, a daughter and Rodney, assisted with the farm work. Viet was aware of their activities.

Rodney often rode with his father on the tractor and was taught to operate it. When driving the tractor through opened gates and making other short moves of the tractor, Rodney operated it and thereby saved the time and effort of his father getting on and off. Mr. Bengford testified his son's help facilitated the work and allowed him to get more done.

During the late spring and summer of 1964 Bengford's work included feeding and caring for 8000 turkeys. They were located about 20 rods from the farm yard in an open field where there were about 12 feeders which required filling with grain. This was done by the use of the Ford tractor to which was attached the Grain-O-Vator wagon.

The Grain-O-Vator wagon, owned by Carlem, was V-bottomed with an auger at the bottom which extended the full length thereof. When in operation this auger carried the grain to a back auger which in turn carried it up and out into a chute to the feeder. The power to propel these augers came from the tractor through the power take-off shaft.

The owner's manual furnished by defendant, Ford Motor Company, which Bengford had studied, contained photographs and printed instructions explaining the various parts and controls for the operation of the tractor. It included a picture of the power take-off (P.T.O.) handle located near the steering wheel.

The manual, exhibit G, contains this: "P.T.O. Handle. This handle is conveniently located in front of the operator as shown in Figure 5. Pull the handle out slowly to engage the P.T.O. shaft. Push the handle in to disengage the shaft."

While operating the tractor Bengford became aware that although the P.T.O. handle was pushed in the shaft continued to turn. He called this fact to Viet's attention who told him it would probably stop after the unit was run for a short time. Viet told Bengford he owned the same model Ford tractor and it also did not completely disengage the shaft when the P.T.O. handle was pushed in.

On July 29, 1964 as was his custom Bengford together with Rodney was using the tractor and wagon to fill the 12 feeders with grain. After the last one was filled and the wagon almost empty Bengford testified he idled the motor and "I pushed the power take-off in. When you push it in, it's supposed to shut off. I thought it had shut off. After I shut it off, I climbed down off the tractor and started closing the feeder lids."

While so engaged Bengford heard Rodney crying for help and upon his arrival at the wagon found Rodney's right leg entangled in the augers. His foot could not be seen. It was partly in the upright auger. Bengford attempted to move the tractor and wagon to get his neighbor's help but found some power was still being transmitted to the augers. He then disconnected the tractor shaft from the wagon.

With the neighbor's help the wagon was disassembled before Rodney could be extricated and taken to a doctor. His right leg below the knee was badly mangled which necessitated amputation.

Viet shortly after the accident reassembled the unit and when he attempted to return it to the farm learned the power take-off was transmitting power and rotating the augers although the P.T.O. handle was pushed in.

Bengford testified he had told Rodney not to get into the wagon. Rodney had no recollection of this admonition. His testi-

mony as to why he got in the wagon is inconsistent. He testified he had gotten into the wagon to stop the auger with his foot as he had done previously. He also testified he was in the wagon to push the remaining grain down to the auger.

The neighbor, Raymond Drey, who helped extricate Rodney, testified it was not unusual in the community for youngsters to ride on tractors helping their fathers and "tractors can be absolutely dangerous if the controls on it don't work the way they are supposed to work."

In the discovery deposition of Paul Viet, read into the record, he stated that in addition to the $370 per month paid to Bengford he was also furnished the farm home for himself and his family. He stated his Ford tractor was just like the one being used by Bengford and "Before Rodney lost his leg, I had personal knowledge that the power take-off unit of my own tractor was continuing to revolve or have power after the switch to it was disengaged or shut off. It was real unhandy to hook it up after you disengaged the power take-off, especially when you first started the tractor. It could be hooked up that way but it was just unhandy and kind of nasty to handle. The problem was more pronounced or more of a problem when the tractor was cold. You have to get off the tractor to shut off the other switch underneath the tractor in order to hook it up to some kind of power."

He also stated he knew the take-off shaft on the Carlem tractor continued to rotate after the shut off handle was pushed in but that he had stopped the turning by just grabbing hold of it. On cross-examination he stated: "Before this accident happened I did not dream the tractor could generate enough power to chew the leg off like it did."

Bob Liechty, a harvester farm equipment dealer for 30 years and an experienced Ford diesel 6000 tractor operator, on Labor Day 1965 tested the Carlem tractor, which remained unchanged at all times. He at-tempted to grab and hold the power take-off shaft with his hands while the power take-off handle was pushed in but was unable to do so.

The following January Liechty again examined and experimented with the Carlem tractor. While the power take-off handle was in the off position ears of corn and a filled sock were dropped into the wagon. The augers were not stopped and the corn went through and was thrown out on the ground. The sock also went through the auger system. He testified Howard Crabb, the Sac City Massey-Ferguson dealer, was present when this test was made.

Direct examination of Liechty includes:

"Q. From your experience as an implement dealer and farm work, have you known a machine to transmit power like that when the switch is supposedly in the off position? A. No, not to my knowledge.

"Q. Would you consider such a piece of equipment that worked in this way as a safe piece of machinery?

"Mr. Vizintos: Object to that as calling for an opinion and conclusion of the witness and invading the province of the jury.

"Mr. Woole: Same objection.

"The Court: Overruled the objection. This man has been in the implement business for a period of 30 years. As to the merits of his opinion, that is a question for a jury to decide, whether he knows what he is talking about. You may answer.

"A. It's my opinion that it's a real unsafe device. I'm also to the opinion that is many more safety—

"Q. Do you sell any machines that the power take-off switch doesn't work when you disengage it? A. I hope not.

"Q. Do you? A. Not to my knowledge."

John Thompson, a farm machinery dealer for 18 years who was then handling the

John Deere line but experienced in selling Ford tractors, a few days before the trial examined the Ford tractor and Heider Grain-O-Vator wagon in which plaintiff was injured. His testimony includes: "While I was there, the Ford tractor was hooked to a Heider auger wagon, and the power take-off handle was in the off position, disengaged position. Power from the tractor to the auger continued to be transmitted at the idle speed. We threw some ears of corn and a small shoe into the auger. They snapped the ears of corn and augered them out through the unloading elevator, and it took the shoe and forced it into the unloading elevator.

"Exhibit J looks like about what happened out there that day. It was around 30 degrees that day. We were out there about 45 minutes to an hour, and the auger never quit running.

"Q. Now in your experience as an implement dealer, have you ever observed anything like that happen with any machinery if it was working properly? A. Not if it was working properly.

"Q. And if you had a piece of equipment with the switch in the off position and it was still transmitting power as you observed it that day, what would you say as to whether that is or isn't a safe condition:

"Mr. Vizintos: Object to that as calling for an opinion and conclusion of this witness, invading the province of the jury.

"The Court: This man has been in business a number of years sufficient in which to give an opinion. The value of his opinion will be determined by the jury. You may answer.

"A. I would assume—I am sure that it's unsafe, I'll put it that way."

The exhibit referred to is a photograph showing kernels, broken ears of corn and a damaged shoe on the ground near the end of the wagon.

On cross-examination Thompson testified:

"Q. Do you have an opinion as to how much pressure it would take to stop the auger in the wagon when hooked to this tractor and when the tractor would be in the disengaged position? Did you make any tests or measure how much pressure it would take to stop it? A. Well, we know it will snap an ear of corn.

"Q. You don't know how much pressure that would be? A. No, I wouldn't know."

On redirect examination Thompson stated: "If I had a John Deere tractor and the thing was working properly, it would not put out power like this one was putting out that day."

Paul Viet was called as a witness by defendants. He testified that in February 1966 together with George Hargraves, a Ford Motor Company engineer, and an attorney for defendants he took part in an experiment with the Ford tractor and the Grain-O-Vator wagon. He stated the augers continued to rotate although the P.T.O. handle was pushed in but they stopped after a shoe was put in the wagon and it had been carried to the back auger. His cross-examination includes: "I own an International Harvester tractor. When I put the shut-off on the power take-off unit in the off position on that tractor, it is a positive shut-off and shuts off and stays shut off."

George Hargraves, a design engineer with the Ford Tractor Division of the Ford Motor Company, testified he inspected the Carlem tractor in October 1965. He testified: "I checked the magnitude of the disengaged drag of the P.T.O. clutch pack with a torque measuring device. The temperature on the day of my inspection was between 50 and 60. I checked the torque, or force that actually turns and rotates the shaft, with the power take-off engagement lever pushed in and disengaged and the selector lever in the forword or high speed

position, and I measured 5 foot pounds of torque. Five foot pounds of torque is counterbalanced by suspending a 5 pound weight on a lever arm one foot long. The torque on the tractor involved in this accident, with the power take-off disengaged, was normal as compared with that on other model 6000 diesel tractors. *The power take-off on this tractor was working as it was supposed to."* (Our emphasis.)

In February 1966 Hargraves observed the tractor and auger wagon together. He stated when the P.T.O. handle was pushed in and a stick put in the auger its rotation stopped. He also described an experiment of placing a boy-sized shoe on top of the auger toward the rear of the wagon and stated it was carried along the spiral of the auger until it intersected the exit tunnel at the rear of the wagon and the auger then stopped.

In answer to a long hypothetical question he expressed his opinion as: "I believe that Rodney's boot would have stopped the auger just as the test did. * * * It's my opinion that five or seven foot pounds of torque could not do that (so injure Rodney)."

Hargraves' testimony on direct examination includes:

"Q. In your opinion is this drag effect hazardous? A. It is inconvenient.

"Q. Is it hazardous? A. I think it is an inconvenience."

Cross-examination of Hargraves includes: "My use of the term or terms 'creep effect' or 'drag effect' is just another way of saying the tractor is transmitting power to the power take-off unit. If you have the power take-off unit turning and it in turn turns the auger in the wagon, it is because there is power coming from the tractor to it. You could not just as well use the term power effect or power transmittal because of the system. The net result is that you have turning. Assuming that the unit in question actually transmitted sufficient power to chew up the corn, as shown in Exhibit H, I would say if the control was fully in that it would be working the way it was supposed to. If it transmitted enough power to chew up the corn and spit it out on the ground, as shown in that photograph, I would say that the unit was a safe unit and working the way it should be. That is the way we designed it. * * * If the Ford tractor transmitted enough power so that it couldn't be stopped by human hand, I would still say that it was working."

DeWitt Tuneberg, mechanic at Midtown Motors at Ida Grove, testified: "The power take-off system on that tractor is in the same working condition today as it was when it was sold to the Carlem Corporation. No one else at Midtown Motors ever worked on the Carlem Corporation tractor."

Tuneberg's cross-examination includes:

"Q. Normally speaking, as a mechanic, if you have a switch that is a shut-off switch and the instructions tell you that when you shut it off the unit will shut off, you expect it to act that way, don't you? A. Yes."

Stephen J. Marley, an assistant professor on the agricultural engineering staff at Iowa State University at Ames with several degrees in agricultural engineering and applied mechanics, examined and tested the Carlem tractor and wagon on February 16, 1966. He testified his test with the engine idling and the power take-off in a disengaged position revealed a torque on the power take-off shaft of about 16 foot pounds. He further stated after about 15 minutes of intermittent operation the torque reading was about 12 foot pounds. He stated the decrease was due to a change of viscosity of the oil in the tractor clutch.

Professor Marley also put a shoe in the wagon. He stated it rode along the auger until it reached the rear of the wagon and then wedged between the auger and wagon box and the auger stopped.

In answer to a long hypothetical question based on plaintiff's version of the accident Professor Marley said: "I believe the

boy would get his foot pinched, but I do not believe that the foot would be drawn underneath the horizontal auger nor into the unloading auger."

On cross-examination he testified the two augers would turn around or revolve only if they were getting power and that it came through the power take-off shaft. When asked about testimony the auger had cut up a shoe Professor Marley stated: "If the auger cut the shoe up, the auger would be capable of cutting up the boy's leg. I would assume it is easier to cut the human flesh, to tear and rip the human flesh, than it is a shoe such as shown in this photograph, Exhibit H."

■ I. Because the primary contention of each defendant on this appeal is a claim of insufficient evidence justifying submission of plaintiff's case to the jury we have attempted to set out the record in detail. In considering the question of the propriety of a ruling on a motion for directed verdict we view the evidence in the light most favorable to the party against whom the motion was made, rule 344(f) 2, Rules of Civil Procedure.

II. The pleaded and sole claim of negligence submitted to the jury by the trial court against Carlem was that it was negligent "In furnishing to, and providing plaintiff's father with a defective piece of machinery, specifically, a tractor on which the power take-off switch was not operating properly."

■ We have often stated the rule that an employer must use reasonable care to provide and maintain for his employees reasonably suitable and safe machinery and tools with which to work. Von Tersch v. Ahrendsen, 251 Iowa 115, 118, 119, 99 N.W. 2d 287, 289, 79 A.L.R.2d 267; Frederick v. Goff, 251 Iowa 290, 295, 100 N.W.2d 624, 627; Mooney v. Nagel, 251 Iowa 1052, 1057, 103 N.W.2d 76, 79; Calkins v. Sandven, 256 Iowa 682, 694, 129 N.W.2d 1, 8; Kregel v. Kann, Iowa, 152 N.W.2d 534, 536. See also 56 C.J.S. Master and Servant §§ 201, 206; 35 Am.Jur., Master and Servant, section 176; Anno. 67 A.L.R.2d 1120, 1130–1132.

■ Carlem in its motion for directed verdict and objections to certain instructions asserted it owed no duty to Rodney on the basis an employer-employee relationship existed between them. Submission to the jury was on the assumption Rodney was Carlem's servant and it was Rodney's master. The trial court thus determined such status as a matter of law. We have no doubt this was error. We hold the evidence insufficient to create a jury question on this issue and Carlem's motion for directed verdict should have been sustained on this ground.

■ An employee or servant is a person bound by duty of service, subject to the master's or employer's command as to the manner in which the work shall be done. Pace v. Appanoose County, 184 Iowa 498, 508, 168 N.W. 916, 919; Meredith Pub. Co. v. Iowa Emp. Sec. Comm., 232 Iowa 666, 672, 6 N.W.2d 6, 10.

In Lembke v. Fritz, 223 Iowa 261, 265, 272 N.W. 300, 302, we quote this from Norton v. Day Coal Company, 192 Iowa 160, 164, 180 N.W. 905, 908. "The relationship of master and servant does not exist, unless there be the right to exercise control over methods and details,—to direct how the result is to be obtained. The power to direct must go beyond telling what is to be done,—to telling 'how it is to be done'."

■ The right of control is the principal test for determining whether an employer and employee relationship exists. State ex rel. Bierring v. Ritholz, 226 Iowa 70, 283 N.W. 268, 121 A.L.R. 1450; Kaus v. Unemployment Com., 230 Iowa 860, 864, 299 N.W. 415, 418; 30 C.J.S., Employee, page 674.

In Uhe v. Central States Theatre Corp., 258 Iowa 580, 581, 139 N.W.2d 538, 539, we say the employer's responsibility for the payment of wages to a claimant is one of

the necessary elements to be considered in determining the question of an employer-employee relationship.

The most the record discloses is that Viet, Carlem's manager, knew Rodney was riding on the tractor and to some extent helping his father. There is a total lack of evidence the boy was bound to perform any service for Carlem. He certainly was not subject to Carlem's command. No claim is made Rodney was to receive compensation in any form from Carlem.

Under the applicable principles of law a jury finding this nine year old boy was Carlem's employee would be entirely lacking in evidentiary support. We do not infer Carlem owed no duty to the boy but it was not that of an employer to an employee.

Our holding is decisive of plaintiff's case against Carlem and makes unnecessary our consideration of Carlem's other assigned errors.

■ III. The general rule as to liability of a manufacturer of a chattel is that a manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by its lawful use in a manner and for a purpose for which it is supplied. The stated rule is found in Restatement Torts, both first and second, section 395. We recognize and apply the rule in Calkins v. Sandven, 256 Iowa 682, 690, 129 N.W.2d 1, 5, and Wagner v. Larson, 257 Iowa 1202, 1223, 136 N.W.2d 312, 325. In each of these recent cases we review and analyze cases from other jurisdictions which need not be repeated here.

Restatement, Second, Torts, section 398 is the same as in the earlier edition. It states: "Chattel made under dangerous plan or design. A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design." We also recognize and apply this rule in Calkins v. Sandven and Wagner v. Larson, both supra. See also 14 Drake Law Review 117.

An extensive annotation on manufacturer's duty as to design is found in 76 A.L.R. 2d 91.

■ Applying these rules to the evidence in this case it seems clear a jury could find defendant, Ford Motor Company, failed to follow these recognized standards of care and that as a proximate cause thereof plaintiff was injured.

IV. Plaintiff in addition to his claim against Ford for tort liability alleged breach of implied warranty of fitness. As we point out in Wagner v. Larson, supra, confusion has existed as to whether a products liability case should be pleaded in and governed by the law of tort or contract but the distinction is no longer very real as long as the plaintiff is in the distribution or consumer chain.

In State Farm, etc., Ins. Co. v. Anderson-Weber, Inc., 252 Iowa 1289, 1301, 110 N.W. 2d 449, 456, we say: "In Iowa the old rule of nonliability for negligence of a manufacturer of goods except to one in privity of contract has been repudiated. See discussion in Thompson v. Burke Engineering Sales Co., 252 Iowa 146, 153, 106 N.W.2d 351, 356 [84 A.L.R.2d 689,] and citations.

"The same reasoning applies in warranty as in negligence cases."

Ford manufactured and sold the tractor here involved with full knowledge it was for farm use and that not only a farm employee, as we had in Calkins v. Sandven, supra, but members of his family would be endangered by its probable use.

Presence of farm children while the tractor was being used should have been reasonably anticipated by Ford. Plaintiff was in the distribution or consumer chain and therefore entitled to the benefits of the implied warranty.

V. Defendant Ford argues plaintiff was required to prove reliance on the implied warranty and also notice of breach thereof within a reasonable time after his injury. The modern trend is against requirement of such proof but under the record here determination of these contentions is unnecessary. The tractor was designed and sold by Ford knowing it continued to transmit power to the shaft although the P.T.O. handle was pushed in and remained in that condition at all times. Ford was fully aware those in the distribution chain would rely on the implied warranty of fitness and could not possibly have been prejudiced from lack of notice of plaintiff's injury based on a claim of breach of warranty.

VI. Ford pleaded as affirmative defenses contributory negligence and assumption of risk. It asserts these defenses were proved as a matter of law. We do not agree.

Generally questions of negligence, contributory negligence and proximate cause are for the jury; it is only in exceptional cases that they may be decided as matters of law. Rule 344(f) 10, R.C.P.

A child of 9 years is presumed incapable of contributory negligence. Kallansrud v. Libbey, 234 Iowa 700, 703, 13 N.W.2d 684, 686, and citations; Twohey v. Brown, 246 Iowa 114, 116, 66 N.W.2d 870, 871. This presumption together with the dispute as to the facts required the trial court's submission of the question of contributory negligence.

VII. The record discloses the torque of the power take-off shaft while the P.T.O. handle was pushed in varied according to the tests made thereof. The power being transmitted to the wagon augers was not always the same. The jury could have found the augers sometimes could be easily stopped but on the day of the accident they stopped only after plaintiff's foot had been wedged in the upright auger.

The fact the augers were rotating was obvious but the extent of the power coming from the tractor power take-off was hidden. This was not such an open and obvious danger as to charge this plaintiff with assumption of risk as a matter of law.

In Perry v. Eblen, 250 Iowa 1338, 1349, 98 N.W.2d 832, 838, we say: "It is a rare case in which one having the burden carries it to the degree of establishing his case as a matter of law." Submission of the question to the jury was proper.

VIII. Plaintiff's witnesses Liechty and Thompson, experienced farm equipment dealers, were each asked whether he considered the tractor a safe piece of equipment. The same objection was made to each question, "Object to that as calling for an opinion and conclusion of the witness and invading the province of the jury."

The objection to the question "as calling for an opinion and conclusion of the witness" is essentially worthless standing alone as it fails to call the attention of the trial court to any specific ground for objection. Opinion and conclusion evidence is not inadmissible solely on that ground. Some specific reason for its exclusion must be stated. It is the duty of counsel to point out the particular defect or defects. Here the only specific ground urged was that it "invades the province of the jury". That objection is generally not available in Iowa. Grismore v. Consolidated Products Co., 232 Iowa 328, 348–362, 5 N.W.2d 646, 655–663; State v. Hodge, 252 Iowa 449, 460, 105 N.W.2d 613, 619; Irlbeck v. Ronfeldt, Iowa, 152 N.W.2d 837, filed September 19, 1967.

The admission of opinion evidence rests largely in the sound discretion of the court and considerable leeway is al-

lowed in this field of evidence for the reason that no matter how the opinion question is phrased or formulated, it remains an opinion which the trier of facts is at liberty to reject. Therefore only in clear cases of abuse would admission of such evidence be found prejudicial. Jones v. O'Bryon, 254 Iowa 31, 35, 36, 116 N.W.2d 461, 464, and citations; Smith v. Cedar Rapids Country Club, 255 Iowa 1199, 1210, 124 N.W.2d 557, 564, and citations; Irlbeck v. Ronfeldt, supra.

 We find no error in the court's overruling of the objection made by defendants.

IX. Regarding the negligence count against Ford the trial court in instruction 2 submitted four specifications of negligence. In instruction 28 the court stated the jury might consider customary use of safer design by other manufacturers upon the question of whether Ford failed to exercise the skill of an expert in designing the tractor involved. Instruction 29 stated the jury might consider the evidence, if any, of customary use and practices of other manufacturers of similar products and the incorporation of available safety products into the Ford tractor.

Ford argues the court erred in submitting these instructions on the ground of insufficient evidence.

Ford also complains of instructions 31, 32 and 35 as to whether Ford knew or had reason to know the tractor involved danger to users and whether it used precautionary means to protect persons from danger. Again Ford asserts the record fails to support the giving of such instructions.

The testimony of Hargraves, Ford's engineer, includes: "Our company has been aware for quite some time of the fact these units (tractor or power take-off units) do move and do transmit power even when in an off position. We know about it and with that knowledge, the unit has not been changed."

 Instructions should be read and considered as a whole. Perry v. Eblen, 250 Iowa 1338, 1348, 98 N.W.2d 832, 838. We have read and carefully considered all the instructions given and the objections made thereto in the trial court. We are not persuaded the court committed reversible error under the pleadings and evidence presented.

X. Defendants' remaining assignment of error is the trial court erred in sustaining plaintiff's objections to interrogatories filed by defendants in preparing for trial.

Defendants propounded to plaintiff six interrogatories to be answered under oath pursuant to rule 121, R.C.P., including: "1. State the name, present address, and position of any and all persons who have been employed or retained by you or either of your attorneys to examine the tractor and/or auger wagon which you claim caused injuries to Rodney Bengford for which you are seeking damages from defendants herein."

The interrogatories were filed after defendants failed to obtain the information sought during a discovery deposition of plaintiff's father. In answer to essentially the same question during that deposition, Mr. Bengford stated: "Dewey Tuneberg and no one else has tested the power take-off for me. My attorney may have had someone test the power take-off; there was somebody out there but I don't know who it was or such and such a date other than that it was this summer after it was warm. I was right there with him at the time and talked with him, but I don't know him, know who he was, or know where he was from. My attorney Mr. McCullough was there that day."

Bengford was then told to ask his attorney who that man was and give defendants the answer. Mr. McCullough instructed Bengford not to answer which resulted in the interrogatories being filed.

Plaintiff's written objection filed to interrogatory No. 1 was that it "asks for material which is in the nature of an attorney's

work product, and is therefore improper." The trial court sustained the objection.

On this appeal plaintiff, in support of the court's ruling, asserts the interrogatory was in violation of rule 143, R.C.P., in that it would require him to list the witnesses he intended to call at trial. He also places great emphasis on the argument the names of the persons sought were solely within the knowledege of plaintiff's attorney and that plaintiff had answered to the extent of his knowledge on oral deposition when he answered he did not know.

The protection given an attorney's work product is afforded by rule 141(a), R.C.P., which provides: "The deponent shall not be required and the court shall not order a deponent or party to produce or submit for inspection any writing obtained or prepared by the adverse party, his attorney, surety, indemnitor or agent, in anticipation of litigation or preparation for trial unless satisfied that the denial of production or inspection will result in an injustice or undue hardship; nor shall the deponent be required or the court order a deponent or party to produce or submit for inspection any part of a writing which reflects an attorney's mental impressions, conclusions, opinions or legal theories, or, except as provided in rule 133, the conclusions of an expert. * * *."

It must be first noted the interrogatory did not seek to obtain or inspect any writing obtained or prepared by the adverse party. It sought only the names and addresses of persons who may have had knowledge of relevant facts concerning the condition of the tractor.

█ In Iowa and elsewhere discovery rules are to be liberally construed. The trend is to broaden the scope of discovery to the end that litigants may have the opportunity to ascertain and present at the trial all the material facts not protected by privilege. Hardenbergh v. Roth, 247 Iowa 153, 161, 73 N.W.2d 103, 107, and citations: Wheatley v. Heidemann, 251 Iowa 695, 702,

102 N.W.2d 343, 348; Crist v. Iowa State Hgwy. Comm., 255 Iowa 615, 623, 123 N.W.2d 424, 431, 8 A.L.R.3d 1418, and citations; 23 Am.Jur.2d, Depositions and Discovery, section 20; Anno. 8 A.L.R.2d 1134, 1136, 1137.

█ This problem has been considered and determined adversely to plaintiff's position in Schaap, Administrator v. Chicago & North Western R. Co., Iowa, 155 N.W.2d 531 (filed January 9, 1968). We quoted 23 Am.Jur.2d, Depositions and Discovery, section 188, p. 539 with approval to the effect that such questions are not objectionable either as privileged or work product. We need not repeat the quotation. We again so hold. The trial court erred in sustaining plaintiff's objection to the interrogatory.

XI. The next question is whether the trial court's error requires reversal and a new trial. We do not believe it does.

In Crist v. Iowa State Hgwy. Comm., supra, 255 Iowa 615, 623, 123 N.W.2d 424, 429, we quote this from 5A C.J.S. Appeal and Error, § 1698, pages 816, 818: "It may be stated as a general rule that harmless error with respect to depositions is not a ground for reversal. Accordingly, a reversal cannot be had for nonprejudicial error in * * * an order compelling, or refusing to compel, answers to interrogatories; * * *."

Following this quotation and citation of authority from other jurisdictions we say: "Indeed, the rule is but a specific application of the thoroughly established principle that nonprejudicial error is never ground for reversal in an appellate court." See also Lundin v. Stratmoen, 250 Minn. 555, 85 N.W.2d 828; Bell v. Swift & Company, 5 Cir., 283 F.2d 407.

We have examined the several assignments of defendant Ford Motor Company and find no prejudicial error.

Reversed as to defendant Carlem Corporation. Affirmed as to defendant Ford Motor Company.

LARSON, SNELL, STUART and Le-GRAND, JJ., concur.

GARFIELD, C. J., and MASON, BECK-ER and RAWLINGS, JJ., concur in part and dissent in part.

GARFIELD, C. J., and MASON, J. concur in the above opinion insofar as it affirms the judgment against Ford Motor Co., but would reverse and remand for trial as against Carlem Corporation with directions to submit to the jury the question whether plaintiff (Rodney) was an employee of Carlem.

BECKER, Justice.

I concur in this opinion insofar as it sustains judgment against Ford. I dissent from the majority's dismissal of plaintiff's case against the Carlem Corporation. It may have been reversible error for the trial court to assume, as it did, that Rodney was an employee of Carlem. Such error might well be grounds for resubmission of the case under proper instructions. It is not grounds for summary final dismissal. At the very least Rodney was entitled to have the jury determine his status as a fact question under proper instructions defining employee and to determine the question of liability under those instructions.

While the majority avows "We do not infer Carlem owed no duty to the boy but it was not that of an employer to an employee", it proceeds to deny the boy a chance to prove liability under proper instructions.

As we said in Anthes v. Anthes, 255 Iowa 497, 504, 122 N.W.2d 255, "The allegations of the petition indicate that plaintiff was on the premises in some legal status. As an invitee, employee or even as a licensee whose presence was known to defendant the plaintiff might have been injured under conditions constituting actionable negligence. If plaintiff was rightfully on the premises he was entitled to proceed with evidence showing his status and breach of duty by defendant." If this evidence, taken in the most favorable light available to plaintiff, failed *as a matter of law* to generate a jury question re the employer-employee relationship it should have been submitted on such status as could be found by the jury. But Carlem suggested no other status. It contented itself with the assertion that there was no evidence to support a finding Rodney was an employee.

For the purposes of this case the majority employs a strict definition of employee. "An employee or servant is a person bound by duty of service, subject to the master's or employer's command as to the manner in which the work shall be done. (citing cases)"

In Lembke v. Fritz, 223 Iowa 261, 265, 272 N.W. 300, 302, we quote this from Norton v. Day Coal Company, 192 Iowa 160, 164, 180 N.W. 905, 908. "The relationship of master and servant does not exist, unless there be the right to exercise control over methods and details,—to direct how the result is to be obtained. The power to direct must go beyond telling what is to be done,—to telling 'how it is to be done'."

We have not always required such strict proof of the right to direct the worker in the minutiae of his chores.

Ganzhorn v. Reep, 234 Iowa 495, 12 N.W.2d 154, involved two farmers who customarily helped each other in their farm work. No money changed hands except at silo filling time when one farmer needed enough additional help so the neighbor was paid. We held the existence or nonexistence of the master-servant relationship was for the jury, quoting from Napier v. Patterson, 198 Iowa 257, 260, 196 N.W. 73, 74: "To constitute the relation of * * * master and servant, it is not necessary that there be an express contract between them, or that the services be rendered for compensation. The relationship may be either express or implied." We also noted Lembke v. Fritz, 223 Iowa 261, 266, 272 N.W. 300, 303: "All the cases agree that the test of the relationship of master and servant is not the actual exercise of power of control over the details and methods to be followed in

the performance of the work, but the test is the *right* to exercise such control."

Erickson v. Erickson, 250 Iowa 491, 94 N.W.2d 728 involved brothers who customarily helped each other with farm work. The case was tried without a jury. We upheld a finding of master-servant relationship. See also Aga v. Harbach, 127 Iowa 144, 102 N.W. 833; Restatement, Second, Agency, Section 5; Subagents and Subservants, Appendix, Section 5, page 36 et seq.; 68 Harvard Law Review 658, 56 C.J.S. Master and Servant, § 174, p. 860, Notes 39 & 48; 35 Am.Jur., Master and Servant, section 12 and section 156.

In Uhe v. Central States Theatre Corporation, 258 Iowa 580, 139 N.W.2d 538, we said: "This controversy centers around the employer's responsibility for the payment of wages to the claimant, which is one of the necessary elements in an employer-employee relationship." This statement relies on Usgaard v. Silver Crest Golf Club, 256 Iowa 453, 127 N.W.2d 636. These cases deal with our Workmen's Compensation Law and Usgaard specifically states: "* * * the major elements of the employer-employee relationship for the purpose of our compensation act are: * * * (2) responsibility for the payment of wages by the employer." (emphasis supplied)

Limited as they are to workmen's compensation cases such holdings did not change Crum v. Walker, 241 Iowa 1173, 44 N.W.2d 701. "The payment of or right to collect wages is not essential to the existence of the relationship. It is sufficient if there be a lawful consideration for the contract of employment. 35 Am.Jur. Master and Servant, § 12; 57 C.J.S. Master and Servant § 563d, page 279 et seq.; Aga v. Harbach, 127 Iowa 144, 102 N.W. 833. Nor is an express contract of employment necessary to create the relationship. It may be implied from the general conduct of the parties in relation to the business. Aga v. Harbach, supra, 127 Iowa at pages 147, 148, 102 N.W. 833; 35 Am.Jur., Master and Servant, § 9 notes 4, 5; 57 C.J.S. Master and Servant, § 563, notes 48–51.

"It is earnestly argued that Harry was not an employee but a legally dependent person (under sections 252.1 and 252.2, I.C.A.) due to the crippled condition of his leg; that he had tried but had been unable to make a living by working for others; that he has been in the hospital; but that excepting for a few months he has lived at home all his life." We held the question of master-servant relationship to be a fact question for jury determination. See also LaPointe v. Chevrette, 264 Mich. 482, 250 N.W. 272 where a tea company store manager hired plaintiff as a delivery boy and paid him out of the cash register in the store. The store manager testified he personally paid plaintiff and the company did not pay the boy. The store's claim it was the policy of the company to make no deliveries (implying that it couldn't be the boy's employer) was not controlling in absence of information to customers and help, by advertising or otherwise, that such policy was in force. The Michigan court held existence of relationship of principal and agent was for the jury under proper instructions.

The jury could find this boy had been doing meaningful work to the corporation's benefit for at least six months. This work was performed with defendant's knowledge and defendant received the benefit not only of this boy's work but that of the whole family. Compensation was supplied through payment to the father. But we say the boy was not an employee *as a matter of law* because there was *no right of control*. A purely gratuitous and empiric assumption. There is ample evidence Carlem had a right to control the boy's actions and in fact did so through the father as agent.

Carlem's general manager of the farm operation, Mr. Viet, testified Mr. Bengford, Rodney's father, was the farm manager for the farm corporation, "Mr. Bengford was the type of worker that you didn't have to check on every day. We told him what to do and he would see that it got done." The father testified, "During the six or seven months between my going to work for the corporation and the day of the accident,

Rodney and my other children helped with work on the farm. Rodney done a lot of work around there, like he would help me feed the turkeys when we had the small ones in the shed, filling the smaller feeders, and a lot of odd jobs around the farm." Carlem chose to accept the benefit of Rodney's labor. But we say this does not make him an employee, *and, more important*, the farm owner does not owe the child the same standard of care it owes the father-employee. *We say this as a matter of law.*

This is an important issue in this case. Where the minor child of a farm laborer actually works the farm for the owner's benefit is he to be shunted aside as an invitee,—or a licensee,—or perhaps a trespasser? The majority would do this because there is no formal contract and we, not the jury but we, cannot see a right of control even though the evidence clearly shows it to be present.

I would reverse as to Carlem with instructions to submit the fact question of Rodney's status to the jury under proper instructions.

RAWLINGS, J., joins in this dissent.